[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 600 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 601 
In Banc.
This suit was instituted to recover judgment against defendants R.C. Bell and H.B. A. Logging *Page 602 
Company, a corporation, on six several promissory notes aggregating the sum of $71,950.82, and $6,000 as attorneys' fees, and for a decree foreclosing plaintiff's lien upon corporate stock pledged to it by said defendants to secure the payment of said promissory notes. Said defendants answered charging plaintiff and Multnomah Lumber Box Company, F.A. Douty and Security Savings and Trust Company with having entered into a conspiracy to deprive said defendants of their property and with having wrecked defendants' business, sold their property without authority and of mismanaging defendants' business affairs entrusted to F.A. Douty at the instigation of plaintiff. Upon motion Multnomah Lumber Box Company, F.A. Douty and Security Savings and Trust Company were made parties defendant. Defendants Bell and said logging company then filed an amended answer alleging more in detail their affirmative defense.
For many years defendant R.C. Bell had been engaged in the logging business. This business had been conducted by him through various corporations controlled by him and in most instances owned by him. He acquired substantially all of the capital stock of defendant H.B. A. Logging Company in 1904. He formed the Campbell Lumber Company and owned 92 per cent of the stock in 1905 or 1906. That company was finally merged with the defendant H.B. A. Logging Company. He also owned the Columbia Logging Company. In this company defendant Douty was associated with defendant Bell for a while. Defendant Bell acquired the interest of defendant Douty in the Columbia Logging Company, and it was also merged with the H.B. A. Logging Company. In 1918 defendant Bell acquired all the *Page 603 
stock of the Kalama Lumber Shingle Company. In 1918 defendant Bell also acquired the North Bank Logging Company. Defendant Bell also owned the Grungstad Lumber Company which he sold in 1919. He also owned the Chinook Lumber Company. That company was formed by him prior to the organization of the Campbell Lumber Company and was absorbed by the latter. He also owned the Seal River Boom Company. This was acquired in an exchange for the North Bank Logging Company. He also "backed" the Western Lumber Company and lost money thereby. All of these different organizations were operated, owned or backed by defendant Bell between 1905 when he started the logging business until 1920 when he retired. Defendant Bell began banking with plaintiff in 1908 and conducted his principal banking business with plaintiff as long as he was engaged in business. On August 16, 1919, a fire occurred in the plant of defendant H.B. A. Logging Company which entailed a heavy loss and caused the cessation of operations by said H.B. 
A. Logging Company for about two months. Defendants Bell and H.B. A. Logging Company claim that after the fire when the plant was again operating it was making a profit of about $500 per day. Defendants R.C. Bell and H.B. A. Logging Company had become heavily indebteded to plaintiff. This indebtedness was represented by the promissory notes mentioned in the complaint. One of said promissory notes was dated November 10, 1919, for the sum of $10,000, payable six months after date and subscribed by H.B. A. Logging Company, by R.C. Bell, president, payable to the order of R.C. Bell at the office of the First National Bank of Portland and by said R.C. Bell indorsed to the plaintiff with waiver of protest, demand *Page 604 
and notice of nonpayment incorporated in the indorsement. Another of said notes was dated the same day for the sum of $12,458.05, payable six months after date, signed by H.B. A. Logging Company, by R.C. Bell, president, in favor of R.C. Bell and by him indorsed to the plaintiff, as the preceding note. Another of said notes was for the sum of $5,608.60, dated February 9, 1920, payable 90 days after date, signed by H.B. A. Logging Company, by R.C. Bell, president, in favor of R.C. Bell and by him indorsed in the same manner as the two preceding notes to the First National Bank of Portland. Another of said notes was for the principal sum of $19,900, dated March 1, 1920, payable 90 days after date to R.C. Bell, signed by H.B. A. Logging Company in favor of R.C. Bell and by him indorsed as the other notes above mentioned to the First National Bank of Portland. Another of said notes was dated March 8, 1920, for the sum of $50,000, payable 90 days after date, signed by H.B. A. Logging Company in favor of R.C. Bell and by him indorsed as the preceding notes to the First National Bank of Portland. Another of said notes was for the principal sum of $5,000, dated March 10, 1920, payable four months after date, and signed by H.B. A. Logging Company, by R.C. Bell, president, in favor of R.C. Bell and by him indorsed as the preceding notes.
The first note above mentioned was for money advanced to defendant Bell to enable him to operate the Kalama Lumber 
Shingle Company after he had taken over that company and agreed to pay its debts. The original advance was $15,000 in November, 1918; $5,000 was paid on said note, leaving a balance of $10,000 for which amount the above-mentioned note *Page 605 
for $10,000 was given. The second note, which was for the sum of $12,458.05, was given for debts contracted by the Kalama Lumber 
Shingle Company before defendant Bell had anything to do in the way of managing that company or owned any stock therein. This note was disallowed by the Circuit Court and no appeal has been taken from his ruling disallowing that note. For that reason no further attention will be given to it. Neither it nor the order of the court based on it is before this court for consideration. The third note mentioned above, being for $5,608.60, was for money advanced to Bell to enable him to operate the Kalama Lumber Shingle Company. The fourth note for the sum of $19,900 was for money loaned to defendant H.B. A. Logging Company. The fifth note for the sum of $50,000 was for money advanced and loaned either to defendant Bell or one or more of his corporations. The amount loaned was $55,000, of which $5,000 was paid and the $50,000 note mentioned above was a renewal of the former notes aggregating that amount. The sixth and last note for the principal sum of $5,000 is an admitted obligation of defendants Bell and H.B. A. Logging Company for money loaned.
All of the above notes were renewals of former notes and, before the renewal dates as above mentioned, said notes had become stale and most of them were placed in what is called the "suspended account." We understand this to mean that the notes were overdue and could not be carried by the bank as liquid assets. While the indebtedness was in this conditon Mr. Wyld, one of the vice-presidents of the bank, called the defendant Bell to the bank and demanded payment. No payment was made at that time but the renewals of the notes incorporated in *Page 606 
the complaint were given instead of the older notes, thus placing the indebtedness in better shape as bankable paper.
In the early spring of 1920 plaintiff sent an accountant to Grays River in the State of Washington, near which the plant of the H.B. A. Logging Company was located, to make an audit of its affairs. The report of the accountant is referred to in the testimony as the "Green Book." Following that report plaintiff, acting through its vice-president, Wyld, placed in charge of the H.B. A. Logging Company a Mr. Weiss for the purpose of conducting its affairs until its indebtedness to plaintiff had been liquidated. Mr. Weiss was appointed by the bank by virtue of the power conferred upon it in the pledge of the capital stock of the H.B. A. Logging Company to it by defendant Bell. The appointment of Mr. Weiss was in writing. The bank promised to pay said Weiss $500 per month, and in case he should liquidate the indebtedness within a certain time therein specified it would pay him the sum of $5,000 as a bonus. The bank notified defendant Bell of the appointment of Mr. Weiss in a letter as follows:
 "The First National Bank of Portland, "Portland, Oregon,
"May 10, 1920.
 "Office of the Vice-president.
"Mr. R.C. Bell, President, "H.B. A. Logging Company, "Corbett Building, City.
"Dear Sir: By this means we take pleasure in introducing to you Mr. Edward Weiss, who, in accordance with the agreement between us, will take full charge of the H.B. A. Logging Company.
"It will be necessary that the H.B. A. Logging Company pass a resolution giving authority to Mr. *Page 607 
Weiss to transact all business on behalf of the company, including the countersigning of checks. It is understood that no disbursements will be made without Mr. Weiss's consent and signature, and that all moneys due when collected will also pass through his hands. Asking your cooperation,
 "Yours very truly, "E.A. WYLD, "Vice-president."
Upon receipt of said letter defendant Bell wrote the following letter to Mr. Adams, also vice-president of said bank:
"May 12, 1920.
"Mr. C.F. Adams, Vice-president, "First National Bank, "Portland, Oregon.
"Dear Sir: I have a letter from Mr. Wyld appointing Mr. Weiss manager of my business at a salary of $500 per month, with a bonus of $5,000 if he pays your account within one year.
"I confess this is quite a shock to me and I presume I will have to comply, as Mr. Wyld told me plainly that if I did not you would take charge of my property and do it anyway.
"I think under the circumstances you should carefully read the following bit of history, with the hope that it will modify your attitude toward me: I owe the bank at present $55,000 which is really a debt of the North Bank Logging Company which you required the H.B. A. to assume, and the balance of the debt, about $43,000 is a debt of the Kalama Lumber Shingle Company which you also required the H.B. A. to assume.
"The H.B. A. company doesn't owe you a dollar of its own account.
"Now for a little history: Last August the H.B. A. burned up — nothing left but a bunch of cinders and some scraps — this brought on the trouble which caused the loss of the North Bank and probably the Kalama company, and I was financially crushed. *Page 608 
Since then I have rebuilt the H.B. A. and got it running and it is now producing a profit of $1,000 per day.
"This building-up cost as follows:
 Town for my crew, with shops ____________ $ 25,000.00 Renewal of wire burned, about ___________ 25,000.00 Necessary equipment — two overhead systems _______________________________ 8,000.00 New rails _______________________________ 3,000.00 New ties ________________________________ 4,000.00 New railroad construction _______________ 10,000.00 New timber (cash advanced) ______________ 35,500.00 New sleds for donkeys burned ____________ 10,000.00 ___________ Total ________________________________ $120,500.00
"This without one dollar assistance from you except $10,000 advance on timber, which I have repaid you.
"In addition to this, I have kept up the interest on your notes, which is proper, but under my other difficulties a little hard.
"This $35,500 in timber I have turned over to you as additional collateral.
"I intend to pay you $5,000 next week on the notes and will pay you at least $2,500 each week until your account is paid in full This will pay you off as quickly as this new man could do it — or, I am willing to turn in to you each week my entire income and let you distribute it.
"I make these offers to try and persuade you to reconsider your demands for this new manager. It is decidedly arbitrary and humiliating. I am getting too old to put up much of a fight and if you insist, I suppose I must consider discretion the better part of valor and let you play your hand, but I protest against it and warn you that my business is now paying $1,000 per day, which your new man might disturb.
"I don't know much about this new man — I understand he was manager of a mill and was successful, but mill men are proverbially poor loggers. You are *Page 609 
a good banker, but might be a very poor grocer — each to his own trade.
"Be reasonable and let me alone — if you must have your money, give me at least three months grace in which to refinance it. If I do not keep my payments up as agreed for any thirty days I will throw up my hands.
"You are putting the screws on at a time when you know the money market is hard.
 "Very truly yours, "R.C. BELL."
Defendant Bell then interviewed Mr. Adams, vice-president of the plaintiff bank, persuading him to have an interview with defendant Bell's friend of long standing, defendant Douty. Defendant Bell also sent for defendant Douty and caused him to interview the plaintiff bank in his behalf and for the purpose of persuading the bank not to persist in placing the affairs of defendant Bell and his corporations in the hands of Weiss or other person for liquidation. The result of the interview between Douty and Wyld, vice-president of plaintiff bank, whom defendant Douty saw, instead of vice-president Adams, was that defendant Douty agreed to assume charge of the affairs of the H.B. A. Logging Company and to execute his own notes in favor of the plaintiff bank as a guaranty of the payment of the indebtedness owed by defendants Bell and H.B. A. Logging Company. This action was taken by defendant Douty to persuade the plaintiff bank to take the affairs of the H.B. A. Logging Company from the hands of said Weiss. Defendant Douty reported the result of his interview with plaintiff bank to defendant Bell. Thereupon the following agreement was entered into between the defendants Bell, H.B. A. Logging Company and Douty and John K. Kollock: *Page 610 
"This contract and agreement, made and entered into this 20th day of May, 1920, by and between H.B. A. Logging company, a corporation, hereinafter designated as the party of the first part, R.C. Bell, hereinafter designated as the party of the second part, F.A. Douty, hereinafter designated as the party of the third part, and John K. Kollock hereinafter designated as the party of the fourth part, witnesseth:
"That it is hereby agreed by and between the parties hereto,
"First: That the party of the third part shall forthwith pay to the First National bank of Portland, Oregon, all indebtedness due and owing to said bank from the party of the first part, which sum including accrued interest shall not exceed $110,000, in promissory notes executed and delivered by said party of the third part, maturing at the rate of fifty-five hundred dollars ($5,500) per month, commencing in June, 1920, with interest at such rate as may be charged by the bank from time to time.
"Second: That any and all of the capital stock of the party of the first part now held by said First National bank, shall, upon such payment be forthwith transferred and assigned so as to vest full voting power to the party of the third part, to be held by him with such voting power until all moneys advanced by him or any of the corporations in which he is interested in the payment of the indebtedness of the parties of the first and second parts to said First National bank, or other obligations elsewhere, whether the same shall be evidenced by promissory notes, cash or by trade acceptances, shall have been repaid by the party of the first part or the party of the second part.
"Third: That upon final payment of any and all moneys so paid or advanced and the retirement of all outstanding obligations executed by the party of the third part or any of the corporations in which he is interested under the terms of this contract, all of said capital stock shall be transferred and assigned so as to vest full voting power to the party of the fourth *Page 611 
part, who shall hold the same upon the following trust arrangement, the execution by said party of the fourth part of this contract to constitute his acceptance of such trust, that is to say:
"To continue in the offices of directors the present directors of the corporation, party of the first part, to wit: F.A. Douty, R.C. Bell and John K. Kollock; to vote said stock at stockholders' meetings and thereby to procure the vote of the directors at directors' meetings so that the property owned by this corporation shall not be transferred to any person, copartnership or corporation until the party of the third part shall have had a thirty-day option to purchase the same at the same price and upon the same terms and conditions as shall be covered by the first bona fide offer received for the purchase thereof. In the event of the death or disability of said John K. Kollock, the Title and Trust company, of Portland, Oregon, shall be substituted as trustee.
"The foregoing provisions for an option to the party of the third part and for the protection of such option are made for the following reasons:
"Multnomah Lumber Box company, an Oregon corporation, of which the party of the third part is president and principal stockholder, is operating under logging contract and agreement of purchase certain properties of the Wahiakum Timber company. The successful conduct of these operations demand at the present time the joint user with the party of the first part of the boom and booming grounds of the Seal River Boom company and of certain logging railroads and involve to some extent joint rafting of logs from the two properties.
"It is therefore understood and agreed that the said option and the protection thereof by trusteeship of the stock of the party of the first part shall continue until it shall be mutually agreed by and between the parties hereto, their successors or assigns, that such cooperation shall be no longer of value to either party. *Page 612 
"Fourth: The party of the third part shall act as treasurer and manager of the party of the first part and as trustee of its funds until such time as any and all moneys advanced in the payment of its present obligations to the First National bank and other creditors, whether evidenced by cash, promissory notes or trade acceptances, shall have been fully paid and discharged, the said party of the third part to have full, exclusive control of the financial operations of the party of the first part, including the incurring of indebtedness, to receipt for payment of moneys, the hiring and discharging of employees and the keeping of any and all books of account and corporate records. The party of the first part agrees to repay to the said party of the third part any and all moneys so advanced, whether evidenced by cash, trade acceptances or promissory notes, together with interest accrued thereon, together with any and all United States internal revenue stamps which may be required in connection therewith, and together with any and all expenses incurred by the said party of the third part in connection therewith, and further agrees to and does hereby absolve the party of the third part from any and all liability in connection with the management of the property, except the willful and deliberate violation of duty by the party of the third part, it being understood and agreed that the said party of the third part is to use his best judgment in the handling of the affairs of the corporation.
"Fifth: It is further understood and agreed that the party of the second part shall receive as compensation for his services to the party of the first part, during the life of this contract, the sum of three hundred ($300) dollars per month, together with traveling expenses and all expenses incurred while absent from the city of Portland on the company's business, as may be authorized by the party of the third part.
"Sixth: It is further understood and agreed that John K. Kollock, of Portland, Oregon, the party of the fourth part hereto, is employed as secretary and *Page 613 
attorney for the corporation; that he will receive no salary or other compensation for his services as director and secretary, but will be paid for his services in the preparation of contracts, minutes and other papers and for legal services which he may render, a reasonable and proper compensation.
"Seventh: This contract is made subject to all the terms and conditions of that certain contract heretofore and on or about the 19th day of October, 1919, made and entered into by and between H.B. A. Logging company and Multnomah Lumber Box company, which contract is hereby in all things ratified and confirmed.
"In witness whereof, the H.B. A. Logging company, party of the first part, has caused this instrument to be executed in its corporate name and its corporate seal to be hereunto affixed, in accordance with a resolution of its board of directors duly and regularly adopted, by its president and secretary, and R.C. Bell, party of the second part, F.A. Douty, party of the third part, and John K. Kollock, party of the fourth part, have hereunto set their hands and seals, the day and year first hereinabove written.
 "H.B. A. LOGGING COMPANY, "BY R.C. BELL, President, "BY JOHN K. KOLLOCK, Secretary, "R.C. BELL. (Seal) "F.A. DOUTY. (Seal)
"Executed in the presence of:
 "M.A. CARR, "J.H. WHITE."
Defendant Douty assumed charge of the affairs of the H.B. A. Logging Company, executed his notes to guarantee the payment of the indebtedness of his co-defendants Bell and H.B. A. Logging Company to plaintiff, borrowed from the defendant large sums of money for the purpose of carrying on the operations of said H.B. A. Logging Company, *Page 614 
made payments on said indebtedness to the amount of $44,000, exclusive of interest. The defendant Multnomah Lumber Box Company advanced large sums of money in carrying on the operations of the H.B. A. Logging Company in addition to the sums borrowed from the bank. After operating said logging company for about two years, defendant Douty ceased operations and proceeded to sell the logging equipment and to abandon the railroad. He took up the rails, sold some of them and leased others to a company operated by him in Lincoln County.
Defendant Bell defends against the notes sued upon, alleging and claiming that a conspiracy existed between plaintiff, the defendants Douty, Multnomah Lumber Box Company and the Security Savings and Trust Company; that defendant Douty was placed in charge of the affairs of defendant H.B. A. Logging Company in pursuance of said alleged conspiracy; that a large part of the indebtedness sued upon was the indebtedness of other companies than defendant H.B. A. Logging Company; that defendants Bell and H.B. A. Logging Company were compelled by duress and threats to execute said notes in favor of plaintiff for the debts of other corporations and without any consideration whatever; that the affairs of said H.B. A. Logging Company were mismanaged by defendant Douty, its property sold without authority and for less than its real value, and seeks judgment against plaintiff, defendants Douty and Multnomah Lumber Box Company for $983,103 damages.
Defendants Bell and H.B. A. Logging Company further allege and contend that plaintiff bank dominated defendant Douty as trustee, compelled him *Page 615 
to sell the corpus of the trust property, operated the plant of the H.B. A. Logging Company at a time when it was inadvisable so to do because of the condition of the market for logs and against the judgment of defendant Douty as trustee; that Douty was in fact the agent of plaintiff bank in serving as trustee and for that reason, as well as for the alleged conspiracy, plaintiff was responsible for the acts and conduct of defendant Douty.
Defendants Bell and H.B. A. Logging Company appeal. Their appeal is based upon the following errors:
"1. That the bank and Douty entered into a conspiracy to secure the property of the H.B. A. and Bell for their own use and benefit, and should, therefore, account for same.
"2. That there existed between the bank and Douty the relationship of principal and agent, and that the acts of Douty were the acts of the bank.
"3. That the bank interfered and intermeddled with the manner in which Douty, the trustee, discharged his trust, and therefore, became liable to the same extent as the trustee.
"4. That the bank accepted the proceeds of the sale of the property of the H.B. A. with full knowledge that same was being sold in violation of the trust agreement and, therefore, became liable to account for the reasonable value thereof.
"5. That the bank was a party to said contract for the reason that it dictated the terms thereof and it was made for its benefit."
AFFIRMED.
This case presents questions of fact nearly altogether. There is but little controversy or difference of opinion about the law involved. There are over 2,000 pages of typewritten testimony, 387 pages of abstract of record, a large dry-goods box filled with exhibits, and about 900 pages of printed briefs besides the printed testimony relied upon by plaintiffs and the typewritten testimony presented by appellants as proving their contentions.
This statement suffices to show that it is not practicable to analyze in an opinion the evidence and present in detail the reasons for finding the facts as we do. Such an opinion would require altogether too much space and would be of no benefit to the profession generally. We do not feel justified in taking either the time or the space to go into detail about the evidence, analyze the testimony and express all our reasons for reaching the conclusion as to the facts. Our efforts will be confined to a general statement of our findings on the questions presented by defendants Bell and H.B. A. Logging Company, who are the appellants. *Page 617 
First, was there a conspiracy between plaintiffs and defendants Douty and Multnomah Lumber Box Company? We think not. In considering this question it is necessary to have in mind the situation of the parties at the time Douty assumed charge and management of the affairs of the H.B. A. Logging Company. At that time defendants Bell and H.B. A. Logging Company were indebted to plaintiff in the sum of over $100,000. Plaintiff had already placed in charge of the affairs of the H.B. A. Logging Company its own employee, Weiss. Defendant Bell had made a vigorous protest and, for the purpose of persuading plaintiff to rescind this action and permit Bell to continue the management of his own affairs and the affairs of his corporations, sent for his long-time friend and some-time business associate, defendant Douty. The latter, at the request of defendant Bell, interviewed vice-president Wyld, who refused to rescind the bank's action of placing Weiss in charge of the affairs of the H.B. A. Logging Company. During the interview, however, Wyld, in behalf of the bank, did agree to permit Douty to take charge of the affairs of that corporation instead of Weiss, providing that Douty would guarantee the payment of the notes owing by defendants Bell and H.B. A. Logging Company. As a result of this conference the contract of May 20, 1920, hereinabove set out in full, was entered into.
On assuming charge of the affairs of the H.B. A. Logging Company, defendant Douty executed his notes in favor of the First National Bank for the full amount of the indebtedness of defendants Bell and H.B. A. Logging Company to that bank. Defendant Douty executed nineteen notes for $5,000 *Page 618 
each and an additional note for five thousand and some odd dollars. It would be extraordinary for one who was conspiring with another to overreach and deprive a third party of his property to become personally obligated to pay the indebtedness of the third party to the other as defendant Douty did for Bell in favor of the First National Bank in this case. That conduct indicates almost anything rather than a conspiracy between plaintiff and defendant Douty against defendant Bell. Before the bank would rescind its action in placing Weiss in charge of defendant H.B. A. Logging Company's affairs and permit defendant Douty to have charge of its affairs, it required defendant Douty to become personally liable for the indebtedness of defendants Bell and H.B. A. Logging Company to plaintiff. In addition to guaranteeing the payment of the notes of defendant Bell and his logging company, defendant Douty borrowed from said bank some $70,000 to enable him to operate said logging company, and in addition to that advanced through his company, Multnomah Lumber Box Company, a large sum of money. Plaintiff might be accused of being harsh in its demands, both upon plaintiff Bell and his friend Douty, but there is no evidence in our opinion indicating a conspiracy between the plaintiff bank and Douty against defendant Bell.
The evidence relied upon by defendant Bell to establish the conspiracy, so far as it relates to the statements of plaintiff's officers and defendant Douty, is denied unconditionally by them. They also deny any conspiracy between them. Defendant testifies constantly that his sole object in taking charge of the affairs of Bell was to help him, if possible, and that his only reason for undertaking that task was *Page 619 
his friendship for defendant Bell and the close intimate relation between his logging interests and those of defendant Bell. The evidence indicates very clearly that up to the time this suit was instituted Douty had become a very heavy creditor of defendant Bell and may lose a very large sum of money. In consequence thereof, there is nothing in the record brought to our attention or which we have found which indicates that plaintiff was trying to do anything other than collect from defendant Bell and his logging company the amounts it and other companies represented by Bell owed the bank. There was a written agreement entered into by plaintiff as well as defendant Bell and his co-defendant logging company at the time Bell took over the Kalama company wherein the subscribing parties to that agreement agreed to postpone for two years any litigation instituted to collect from the Kalama company. The conduct of the bank in placing Weiss in charge of defendant Bell's affairs may be, to a degree, a breach of the spirit of that agreement, but Douty in no way participated in that breach. The action of plaintiff bank in taking over the affars of defendant H.B. A. Logging Company resulted from the audit made by plaintiff's accountant. That audit revealed that defendant Bell, instead of making $500 per day out of his logging operations was actually losing. It also revealed that his property was rapidly depreciating and his timber rapidly disappearing. This accountant recommended to the bank that it take the action it did. We do not find any warrant in the pledge given the bank by the H.B. A. Logging Company for this action on the part of the bank. It could, however, under its pledge, have sold all the capital stock of the H.B. A. Logging Company *Page 620 
because its capital stock had been pledged to the bank by defendant Bell. Defendant Bell probably could have prevented the bank from taking over the management of the affairs of defendant H.B. A. Logging Company, but he did not attempt to do that by litigation. It probably was inadvisable to do it at that time. But Bell, having acquiesced, or rather having procured a different arrangement voluntarily and entered into an agreement with defendant Douty, to which agreement plaintiff bank was not a party, he cannot now be heard to say that he was coerced or compelled to enter into such an arrangement by duress. He could have stood upon his legal rights and doubtless would have done so but for the fact that from his then viewpoint he would fare better by entering into the arrangement he did than to have his affairs in litigation. Conceding, but not holding, that the bank was harsh in its method of collecting the amount due it from defendant H.B. A. Logging Company, yet it was within its legal rights. Defendant Bell was no more laboring under legal duress than is any other debtor who is unable to meet his obligations when his creditor is unwilling to further postpone liquidation. We find that there was no conspiracy.
Did the defendant Douty sustain the relation of agent to plaintiff? We think not. We think that Douty was no more the agent of the plaintiff bank than Bell would have been if he had undertaken to liquidate his indebtedness by conducting his own affairs. The bank had required of Douty that he guarantee the payment of all of Bell's notes. That requirement on the part of plaintiff indicates very clearly that it was not placing Douty in charge of those affairs as its representative. The bank was *Page 621 
interested in the manner in which Douty should conduct the affairs of the defendant H.B. A. Logging Company because the manner of conducting those affairs in a large measure would determine whether plaintiff would be paid its indebtedness, and, if so, when. The bank made it clear in its letters to Bell that it would insist on his indebtedness being paid. Bell believed he could pay that indebtedness by operating his plant. Evidently defendant Douty believed that that end could be accomplished in that manner. For that reason he undertook the management of the affairs. It is very evident that the bank had serious doubts about it or it would not have exacted from Douty such drastic terms as to require him to become personally liable for the large indebtedness of defendant Bell in the creation of which Douty had nothing to do. Douty was neither legally nor morally obligated to pay any part of Bell's indebtedness to plaintiff. Yet plaintiff, before it would release its hold upon the property through its agent Weiss, exacted from the party, whom Bell appealed to, the very severe terms of becoming personally liable for that indebtedness. The fact that the bank insisted upon Douty, after he went into the management of the H.B. A. Logging Company, conducting those affairs in a certain way, does not prove that Douty was the agent of the bank, but rather that Douty, as well as Bell, so far as the affairs of the H.B. A. Logging Company were concerned, was under compulsion because of his large indebtedness to plaintiff to give heed to plaintiff's demands. The only way either Douty or Bell could have prevented the bank from exercising a large degree of authority over the affairs of defendant H.B. A. Logging Company would have been to have stood strictly *Page 622 
upon their legal rights. Doubtless, they both believed to have done so would have been worse for Bell than the course they followed.
Did the bank interfere and intermeddle with the manner in which defendant Douty discharged his trust under the agreement of May, 1920? We think not in a legal sense. This question has already been largely answered in the preceding paragraph. The interference, such as it was, was the stand taken by the bank in which it determined to liquidate the indebtedness. As we before said, the bank's conduct may have been harsh, but it had a right to insist upon the payment of the debts defendants owed it. There has been no evidence pointed out to us wherein the bank did other than to threaten to do what it had a legal right to do. Every debtor who has property that may be seized to compel him to pay his debts acts, more or less, under duress in a sense when he is compelled to pay his debt by a forced sale of his property. Such, however, is not legal duress as long as the creditor acts strictly within his legal rights. A creditor has a right to say to his debtor: "You must pay me. If you do not pay me I will take the necessary legal steps to force you to pay me." If the indebtedness is secured by a mortgage the creditor has a right to say: "I will foreclose that mortgage or I will take your property and subject it to the payment of your indebtedness to me." That, in effect, is what plaintiff did to defendant Bell when he said he would put a man in charge of defendant's property whether he wanted it to or not. It may be that plaintiff could not have done just that thing in that way but he could have sold defendant Bell's stock in the H.B. A. Logging Company and thereby deprived Bell of all *Page 623 
of his stock. It could then have foreclosed its lien on the real property and other property belonging to Bell or his corporation situated in the state of Washington and sold it at forced sale. Defendant Bell realized that for the bank to have proceeded in that manner would have meant his absolute ruin financially. He preferred, doubtless, to proceed as he did proceed. The court cannot serve as controller of the morals of litigants as long as they keep within their legal rights. A court of equity in such matters must follow the law. We find that none of the acts of plaintiff bank constituted an illegal interference or intermeddling with the affairs of defendant H.B. A. Logging Company and defendant Douty's management thereof as trustee. In this connection it must be kept in mind that either plaintiff or defendant Security Savings and Trust Company held title to all the real property of defendants Bell and his said logging company as security for said indebtedness. Plaintiff could have foreclosed its lien on said property which would have stopped the operations of defendant logging company sooner than they were stopped by defendant Douty.
Did the plaintiff become liable to account for the reasonable value of the property sold by defendant Douty as trustee because it accepted the proceeds of such sale with knowledge of the contents of the agreement between said Douty, Bell, H.B. A. Logging Company and John K. Kollock? We think not. Defendant Douty was not under the control of the bank to any greater extent than a debtor is under the control of his creditor when the debtor is forced to liquidate. Plaintiff was endeavoring to collect the amount owing to it by defendants Bell and H.B. 
A. Logging Company. Plaintiff, in *Page 624 
order to accommodate its debtors, permitted their trustee, said Douty, to operate its debtors' plant. To that end it advanced $70,000 to cover the expenses of such operation. Plaintiff had caused the affairs of defendant H.B. A. Logging Company to be examined into and as a result believed said logging company to be insolvent or in danger of insolvency. For that reason it placed a Mr. Weiss in charge of the business affairs of said logging company. At the earnest request of defendant Bell Mr. Weiss was withdrawn and Mr. Douty permitted, so far as the bank was concerned, to take over the affairs of said logging company. The agreement under which said Douty took charge of those affairs specified, among other things, that said Douty should "forthwith pay to the First National bank of Portland, Oregon, all indebtedness due and owing to said bank from the party of the first part (H.B. A. Logging company), which sum including accrued interest, shall not exceed $110,000 in promissory notes executed and delivered by said party of the third part, (F.A. Douty) maturing at the rate of fifty-five hundred dollars ($5,500) per month, commencing in June, 1920, with interest at such rate as may be charged by the bank from time to time.
"That any and all capital stock of the party of the first part now held by said First National bank, shall, upon such payment, be forthwith transferred and assigned so as to vest full voting power to the party of the third part, to be held by him with such voting power, until all moneys advanced by him or any of the corporations in which he is interested in the payment of the indebtedness of the parties of the first and second parts (R.C. Bell) to said First National bank or other obligations elsewhere. * *"
It thus appears from the contract under which defendant Douty was operating that he was required *Page 625 
to pay the indebtedness of defendant Bell and his corporation, said logging company. He could not pay said indebtedness by operating the plant. After operating it about two years Douty lost money rather than made money. The timber which was accessible to the railroad had been practically exhausted. Douty had been compelled to pay money for timber accessible to the railroad and which defendant logging company had under contract of purchase in order to continue operations as long as he did. In order to continue operations it would have been necessary to have extended the railroad from a mile to three miles. The extension would have been expensive because in a rough country. Neither defendant Bell nor his said logging company had any funds. Douty as trustee was under no obligations, legal or moral, to advance money for the purpose of extending the railroad and purchasing additional timber. While defendant Douty had reduced the indebtedness of defendant Bell and his said logging company to the First National Bank, he had done so by substituting himself and his company, the Multnomah Lumber Box Company, as creditors. He could not pay the indebtedness of said defendant Bell and his said logging company without selling the corpus of the trust. Under such circumstances we think the authorities are generally agreed that a trustee is authorized to sell the body or principal of the property held under trust.
It is argued that the property was not conveyed or transferred to defendant Douty, but by the terms of that agreement, upon payment of the indebtedness to the bank, all of the corporate stock of said logging company was to be assigned and transferred *Page 626 
by the bank to Douty as trustee. He had been required by the terms of the trust agreement to pay the indebtedness which it was impossible for him to pay without a sale of the property owned by defendants Bell and his said logging company, the trustors:Brown v. Brown, 7 Or. 285; Crown Co. v. Cohn, 88 Or. 642
(172 P. 804); 5 C.J. 1218, §§ 332, 333; 2 Perry on Trusts (6 ed.), 1264, 1269, §§ 764-766. In said section 766, the author says:
"Any words which show an intention to create such power, or any form of instrument which imposes duties upon a trustee that he cannot perform without a sale, will necessarily create a power of sale in the trustee. Thus an assignment in trust to pay debts will necessarily imply a power of sale, though none is given in words.
"Even though no express power of sale is contained in an instrument creating a trust, such a power will be implied when necessary in order to carry out the purpose of the trust and the duties imposed upon the trustee, or where it is apparent from the whole instrument that the settler intended that all or a part of the property should be sold. Thus, a power of sale will be implied from the power and duty to pay debts. * * (39 Cyc. 351. See also extended notes to First Baptist Church v. AmericanBoard of Commissioners, Ann. Cas. 1916D, 404, said note beginning in page 410.)"
28 Ency. of Law (2 ed.), 1002, paragraph (C); Robinson v.Robinson, 105 Me. 68 (72 A. 883, 32 L.R.A. (N.S.) 675), and note beginning in page 676.
"A power of sale need not be conferred on a trustee in direct or express terms, but may be implied from the purposes of the trust. Generally speaking, whenever a trustee is directed to do something, the doing of which cannot be accomplished otherwise than by a sale, then a power to sell is implied, and *Page 627 
many courts refuse to imply the power unless there is a necessity for the sale arising out of the powers conferred. (26 R.C.L. 1285, § 136.)"
The purpose of placing the management and the property of the H.B. A. Logging Company was the payment of its debts. Defendant Douty had demonstrated by his experience that those debts could not be paid by operating the plant of said logging company. It became necessary, therefore, by the terms of the trust agreement, to sell the property because payment of the settlers' debts was the very purpose of conferring the trust.
The trust agreement was entered into for the purpose of enabling defendants Bell and his said logging company to carry on their business through their chosen trustee, defendant Douty, and for the benefit of said defendant Bell and his said logging company's creditors. The only creditors named are the plaintiff bank and defendant Douty. But defendant Douty, as trustee, is authorized to pay the debts owing to his corporation or any corporation in which he has an interest, as well as any other creditors of defendant Bell or his said logging company. The law is well settled and very general that in such cases the trustee must conduct the affairs of the settler for the benefit of the creditors: 2 Perry on Trusts (6 ed.), 952, et seq., §§ 585, 588, 589, 591.
As clearly showing that the intent of the trust agreement was to pay the debts of defendants Bell and his logging company to plaintiff, the following correspondence, which led up to that agreement, is cited: *Page 628 
"Mr. R.C. Bell, President, "H.B. A. Logging Company, "Corbett Building, City.
"Dear Sir: By this means we take pleasure in introducing to you Mr. Edward Weiss, who in accordance with the agreement between us, will take full charge of the H.B. A. Logging company.
"It will be necessary that the H.B. A. Logging company pass a resolution giving authority to Mr. Weiss to transact all business on behalf of the company, including the countersigning of checks. It is understood that no disbursements will be made without Mr. Weiss's consent and signature, and that all moneys due when collected will also pass through his hands. Asking your cooperation,
 "Yours very truly, "E.A. WYLD, Vice-president.
"Mr. Edward Weiss, "Portland, Oregon.
"Dear Sir: Confirming our conversation of Saturday last and the understanding between us, be good enough to take charge of the operations of the H.B. A. Logging company, situated at Gray's River, Wash., on the following terms:
"1st. Salary of $500 per month, to be paid you subject to thirty days notice by either party.
"2d. Provided the indebtedness of the H.B. A. Logging company to the First National bank, which at date amounts to $102,955.81 with an indirect liability on endorsement of $60,358.94, is entirely liquidated within one year, a bonus of five thousand dollars ($5,000) will be paid you in addition.
"It is understood that you will assume entire control, that no moneys will be disbursed without your signature, all checks will be countersigned by you and that all moneys received will pass through your hands.
 "Yours very truly, "E.A. WYLD, Vice-president." *Page 629 
Following these two letters is a letter from defendant Bell to C.F. Adams, copy of which appears in the statement hereinabove.
It may be and probably is a fact that because plaintiff bank did not accede to defendant Bell's wishes that defendant Bell entered into the contract with defendant Douty which constitutes the trust agreement, but, as we have before stated, plaintiff bank was within its rights in insisting that the amount owed it by defendant Bell and his said logging company be paid. Defendant Bell evidently preferred to make his own arrangement about a trustee rather than to have the bank select a man to have charge of his affairs. He made the election and cannot complain because the bank exercised its right to insist that the trustee chosen by defendant Bell should so conduct his affairs as to pay the bank the amount owing to it.
Before defendant Douty sold any of the trust property he addressed the following letter to defendant Bell:
"Mr. R.C. Bell, "589 Sixth street, Portland, Ore.
"Dear Sir: If we are able to continue logging at present rate, we should be through with all the available timber on the present constructed road by May 1st, at the latest. There is no suitable timber in that locality to which further extension of the road can be made. We understand there is about 75,000,000 feet of timber on that side of Gray's River that can be reached by building about three miles of track from the H.B. A. main line, from the place the grade starts.
"So far as we are concerned, we do not want to continue the operation by being required to make additional purchases and expenditures in construction. You, of course, understand that a large portion *Page 630 
of the equipment is getting old, and the upkeep of it is enormous, so that for continued logging operation it would be necessary to make considerable increased expenditures in new equipment. The banks are now making a complete audit of the H.B. A. company's books, showing the transactions from the time we started operating the camp, and they also advise us that they are going to have an appraisement made of the equipment as well as the remaining timber and logs on hand, in order that they may know just how much of their indebtedness will be liquidated from the timber and logs and what portion of the equipment will have to be sold to liquidate the balance of their claim.
"After this audit and appraisal has been completed, we will endeavor to get a copy of same, so you can go over it in detail, if you care to. We have expected for some time to be able to furnish this to you, but they have delayed the work for over 60 days. The audit and timber on hand will show quite a sum of money still due them after the marketing of all the timber, so we know their plan is to either junk the equipment under their mortgage or sell it to someone wanting to continue there. In fact, they want the matter closed up, and are not inclined to permit it to run longer than June 1. They have advised us to this effect.
"We thought it best to call your attention to this matter at this time in order that you might have an opportunity to try and reorganize in some way to get your operation into the 75,000,000 tract.
"There are a number of eastern people coming to the coast now, looking for logging operations, and it might be possible to make some deal whereby the key to the situation there would be an inducement for someone to go in and in that way get more out of the equipment and construction than could be realized from a junk standpoint.
"You, of course, understand that we have been required to advance a large sum of money ourselves, as the bank was not inclined to do so, and we are *Page 631 
very anxious that some effort should be made to induce someone to take the outfit and extend it into the above tract of timber. As far as we are concerned, we are shifting our logging operations to Lincoln county, where we can get plenty of spruce, and, of course, are not interested in the Gray's river situation, because there is very little spruce there.
"This matter of trying to interest someone in the future operation should be given immediate attention and not wait until the audit and appraisal is completed, as that probably will not be finished much before the time the timber is logged. We suggest that you call the writer on the phone and make an appointment to discuss this matter, and oblige,
 "Yours very truly, "H.B. A. LOGGING Co., "F.A. DOUTY, Treasurer."
To this letter Bell made no response. It occurs to us that Bell should have been sufficiently interested in the conduct of his own affairs to have responded to this letter rather than to have permitted his trustee to proceed without defendant Bell's aid, assistance and counsel. Bell is not put in a good light, to say the least, by his refusal to interest himself in finding a way to so manage his affairs as to pay his creditors.
Complaint is also made because defendant Douty did not forthwith pay the indebtedness of defendant H.B. A. Logging Company as mentioned in said trust agreement. The trust agreement also prescribes that said indebtedness should be paid with the notes of defendant Douty. Appellants argue that the payment of the notes of defendant H.B. A. Logging Company was a condition precedent to the operation of the trust. The trust agreement prescribes that said notes should be paid in monthly installments of $5,500 each. It thus *Page 632 
clearly appears that the parties did not contemplate that the notes of Douty should be accepted by the bank in absolute payment of the trusters' indebtedness to the bank. Taking the trust agreement as a whole we think the intention of the parties was to satisfy the bank by defendant Douty becoming personally liable for the indebtedness of defendant Bell and his logging company and that such indebtedness should be paid in monthly installments of $5,500 each. The word "payment" as used in the trust agreement must be construed broadly as meaning the assumption of that indebtedness by defendant Douty and not the absolute cancellation of the indebtedness of defendant Bell and his logging company.
It is also urged that the trust agreement was violated in this, that the Multnomah Lumber Box Company advanced large sums of money and was substituted to a large extent as trustee instead of defendant Douty. It is quite evident that it was in the minds of the parties to the agreement that some of the corporations under the control of defendant Douty should be utilized in operating the business of defendant H.B. A. Logging Company. The agreement itself specifies
"that any and all of the capital stock of the party of the first part now held by said First National Bank shall, upon such payment, be forthwith transferred and assigned so as to vest full voting power to the party of the third part to be held by him with such voting power until all moneys advanced by him or anyof the corporations in which he is interested in the payment ofthe indebtedness of the parties of the first and second parts tosaid First National bank or other obligations elsewhere." *Page 633 
Was the plaintiff bank a party to the said trust agreement? We think not in the sense in which appellants claim it was a party. As hereinabove stated the bank was interested in the execution of the trust confided in defendant Douty by defendant Bell and his said logging company. Plaintiff was a beneficiary under that trust agreement. It was the duty of defendant Douty so to conduct his trust in accordance with the agreement that his trusters' debts should be paid to the bank. The fact that the bank insisted on the execution of the trust and received the proceeds of the sale of the property does not make it in any sense liable for an accounting to the settlors nor for mismanagement by the trustee.
The law requiring a strict account by a trustee is universal: Wells v. Wood, ante, p. 38 (263 P. 54). Defendant Douty, as trustee of his co-defendants Bell and said logging company, must account for his conduct of the affairs of his trusters. The attorneys for defendants Bell and his said logging company specifically requested the Circuit Court to postpone the accounting to which they are entitled until the other issues in the suit shall have been determined. Notwithstanding that fact, they complain in their brief because an accounting was not fully made in this proceeding. We cannot entertain that complaint at this time because defendant Bell and his said logging company are estopped from so doing by their specific request that such accounting be postponed.
We repeat that to examine and discuss all of the questions raised by appellants would occupy too much space and time. We have considered all of the questions raised, carefully examined all of the evidence *Page 634 
advanced to support appellants' contentions and thoroughly studied the authorities submitted.
We find no error in the record and the decree is affirmed.
AFFIRMED.
BELT, J., absent.
ROSSMAN, J., took no part in the decision of this case.