Argued February 10, reversed in part, modified in part and remanded for further proceedings June 21, petition for rehearing denied July 15, 1977

## COMMUNITY BANK, *Appellant,*

### v.

## JONES, *Defendant,*
## ELL et al, *Respondents.*

## (No. 398-193, SC 24274)

566 P2d 470

[ 648-a ]

Ferris F. Boothe of Black, Kendall, Tremaine, Boothe & Higgins, Portland, argued the cause and filed briefs for appellant.

Leslie M. Roberts of Kell, Alterman & Runstein, Portland, argued the cause and filed a brief for respondent Roy Ell.

Diane Spies, Portland, argued the cause for respondent George Vassil. With her on the brief were Connall & Spies, P.C., Portland.

J. W. Rosacker, Portland, filed a brief for respondent Ray Bruce.

Before Denecke, Chief Justice, Holman, Tongue, Howell, Bryson, Lent, and Bradshaw, Justices.

BRYSON, J.

**BRYSON, J.**

Plaintiff (Bank) filed this suit (consisting of 11 causes of suit) to have its security interest covering the automobile inventory of defendant Robert L. Jones (Jones), an automotive wholesaler doing business as Robert L. Jones Motor Company, declared a first and prior security interest in Jones' inventory. Plaintiff further alleged and prayed for "judgment in favor of Plaintiff and against Defendant Jones in the amount of all sums owed Plaintiff * * *"; the appointment of a receiver to take possession of all collateral; and foreclosure of its security interest in the inventory or the proceeds thereof.

Defendants Roy Ell (Ell), George Vassil (Vassil) and Ray Bruce (Bruce) were joined as transferees of the collateral and proceeds in which plaintiff claimed its security interest. Against these defendants plaintiff sought a decree declaring their interests to be inferior to plaintiff's security interest and

"[d]irecting the defendants to deliver said [inventory] to the Department of Justice Services within ten (10) days or otherwise entering Judgment against each said defendant for the value of collateral or amount of collateral proceeds he received and withheld, whichever is greater."

These defendants denied that plaintiff had an interest in the disputed collateral and asserted various affirmative defenses.

Plaintiff appeals from the trial court's decree that it is not entitled to possession of the inventory, or to the receipts from the sale thereof, from defendants Ell, Vassil and Bruce and from the court's findings of fact and conclusions of law as hereinafter related.

Before proceeding to the merits of the case, one preliminary matter requires our attention. Prior to trial, defendant Jones entered into an agreement with plaintiff stipulating his liability and consenting to all

the relief sought against him by plaintiff.[1] Also prior to trial, all of the contested collateral was sold by defendants. At the beginning of the first day of trial defendants moved that they be granted a trial by jury, counsel for defendant Ell arguing as follows:

> "In light of what happened yesterday, it appears to Defendant Ell in the settling of the judgment by Mr. Jones, that this is no longer a foreclosure action but an action in law in conversion, interfering with the Bank's collateral, and it has become an action for which the Defendant Ell is entitled to a jury, and Defendant Ell requests a jury, and in light of the changes in the case, — which we had no knowledge of yesterday, — it is no longer proper to have an equity case, and Defendant Ell respectfully requests a jury."

Defendants' motion was denied and the case was tried as one in equity. Defendant Vassil's motion at the close of plaintiff's case to dismiss for failure to prove an equitable cause of suit and defendant Bruce's similarly timed demurrer were likewise denied.

■ Having prevailed below, defendants do not cross-appeal the denial of their motion for a jury trial. However, in determining the proper scope of our review, we must, as a preliminary matter, determine whether this lawsuit is one at law or in equity. *See, e.g., Lieuallen v. Heidenrich,* 259 Or 333, 485 P2d 1230 (1971); *Trans. Equip. Rentals v. Ore. Auto. Ins.,* 257 Or 288, 292-93, 478 P2d 620 (1970); ORS 19.125; Oregon Constitution Art VII (Amended), § 3.

The rights of a secured creditor on default are set forth in ORS 79.5010, which provides in relevant part as follows:

> "(1) When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in ORS 79.5010 to 79.5070 and except as limited by subsection (3) of this section those provided in

---

[1]Since Jones' stipulation reduced him to a nominal party to this case, the term defendants is used to refer only to defendants Ell, Vassil and Bruce, unless otherwise noted. The remaining defendants were dismissed from the case.

the security agreement. *He may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure. * * *"* (Emphasis added.)

■ The Oregon Uniform Commercial Code (Code) does not, by itself, establish any judicial remedy at law or in equity. It merely preserves to the creditor recourse to remedies available to him under pre-Code law. See, Davenport, *Default, Enforcement & Remedies Under Revised Article 9 of the Uniform Commercial Code,* 7 Val U L Rev 265, 304 (1973); Heath, *Remedies and Collateral Liquidation Under Uniform Commercial Code Article 9,* 4 Gonz L Rev 217, 228 (1969).

■ We find the instant case to be a suit in equity. It is essentially a creditor's suit brought to determine the respective rights of multiple parties, each of whom claim to have, or to have had, interests in contested collateral. In *Security S. & T. Co. v. Portland F. M. Co.,* 124 Or 276, 305, 261 P 432 (1928), we quoted with approval the following from *Wyman v. Wallace,* 201 US 230, 26 S Ct 495, 50 L Ed 738 (1906):

> " '* * * Whenever a creditor has a trust in his favor, or a lien upon property for the debt due him, he may go into equity without exhausting legal processes or remedies. * * *' "

*See also Dawson v. Coffey,* 12 Or 513, 518, 8 P 838 (1885).

■ 4 Pomeroy's Equity Jurisprudence § 1415 (5th ed 1941), at page 1066, states:

> "* * * Creditors' suits were therefore permitted to be brought in those instances where the relief by execution at common law was ineffectual; as for a discovery of assets; to reach equitable and other interests not subject to levy and sale at law; and to set aside fraudulent conveyances and obstructions." (Footnotes omitted.)

In the instant case, some of the collateral in which the Bank claims a security interest was transferred to defendants by Jones prior to suit. The complexity involved and procedural flexibility required to proper-

ly order priorities and property rights where multiple parties claim conflicting interests in the same collateral (or proceeds therefrom) renders a creditor's relief at law inadequate and brings the issue within the jurisdiction of the equity court. In such a case, it is not decisive that the recovery will be money nor that the primary debtor is only a nominal party to the suit. *See Stumbo v. Hult Lumber Co.,* 251 Or 20, 444 P2d 564 (1968) (suit for declaration of property interests in inventory); *Evans Products v. Jorgensen,* 245 Or 362, 421 P2d 978 (1966); *Stotts v. Johnson and Marshall,* 192 Or 403, 234 P2d 1059, 235 P2d 560 (1951) (rights and liabilities of conflicting claimants determined incident to a suit for foreclosure).

We review de novo, and an abbreviated review of the facts reveals the following. Jones operated a used car wholesale and retail business in Portland, Oregon. At the time of his financial failure and the collapse of his business in December of 1973, he had an inventory of some 130 vehicles with an estimated value in excess of $200,000. Prior to that date his average dollar volume was estimated to have been between $200,000 and $300,000 per month. Jones' business was highly leveraged[2] and depended upon rapid inventory turnover to generate the cash flow needed to cover his financing and operating expenses. Jones obtained financing by flooring[2a] vehicles with the plaintiff. Jones also did financing with noninstitutional lenders; namely, defendants Ell, doing business as Ell Motor Company, Vassil, and James E. McClincy.

Community Bank began financing Jones in 1970 and entered into an "Inventory Loan and Security

---

[2]Leverage may be defined as the amount of money borrowed by the party in business in excess of the money or assets invested in the business. The greater the amount of the money borrowed in excess of the party's money or assets invested, the greater the "leverage" on invested assets.

[2a]"Flooring" is a common method of inventory financing of vehicles or boats bearing a title and capable of being licensed. Lenders finance by filing a security agreement and retaining the titles and trust receipts to such vehicles as security. The financing institution keeps a ledger of all such vehicles or collateral.

Agreement" on October 28 of that year. A financing statement was filed two days later, on October 30.[3] When Jones subsequently moved his business to a new location, he and the Bank executed and filed a second security agreement reflecting that change of address. The second security agreement was executed on April 19, 1972, and filed eight days later, on April 27. Both security agreements cover future advances and give plaintiff a security interest in after-acquired property and proceeds.

In addition to its security agreements of October 28, 1970, and April 19, 1972, plaintiff took trust receipts and titles covering specific vehicles as security for its loans.

Ell began financing Jones in 1970 or 1971. Like the Bank, Ell took trust receipts and titles to specific automobiles to secure his loans to Jones. A general security agreement was entered into by Jones and Ell on October 14, 1971, and amended December 15, 1971. However, it purports to grant Ell a security interest only in those vehicles specifically identified in the trust receipts taken by Ell, and the proceeds therefrom. The Ell and Jones security agreement of October 14, 1971, stated, "2. Each loan Ell decides to make to Jones shall be secured by a particular automobile acceptable to Ell." No financing statement was filed by Ell until October 18, 1971.

The evidence shows Ell to have been advised by his attorney of the Bank's prior perfected security interest on April 22, 1971, but Ell made no inquiry of plaintiff to determine the extent of that security interest. Ell financed cars only after they were in Jones' possession.

George Vassil began financing used cars for Jones in 1972. He also took trust receipts as security for his loans but, unlike the Bank and Ell, entered into no

---

[3] An earlier financing statement was filed by plaintiff on March 2, 1970; however, no security agreement prior to the October 28 agreement was received in evidence.

written general security agreement with Jones and filed no financing statement. He financed cars only after they were in Jones' possession.

■■ The excessive leverage on assets attempted by Jones in the operation of the R. L. Jones Motor Company was reflected in the potential overdrafts experienced by him from the beginning of his relationship with the Bank in 1970. A potential overdraft occurs whenever the Bank is presented with checks against an account totaling an amount greater than cash in the account and checks deposited but not collected from the payor banks.[4] If the Bank pays the checks presented against the account before the checks deposited are collected, the result is an overdraft.

By 1972 Jones' potential overdrafts had become a regular occurrence and a course of dealing developed whereby Jones' secretary would call the Bank each day to determine the amount of Jones' potential overdraft and then bring in sufficient deposits to cover it. Although the Bank sometimes paid the checks presented against Jones' account before the deposits covering them were in fact made, these payments were not identified as overdrafts.

Representatives of the Bank testified that this course of dealing was not intended to serve as a line of credit or loan to Jones. However, the evidence shows that in 1973 Jones' potential overdrafts averaged $50,000 per day.

Jones' inventory was stocked to a large extent with larger cars. When the gasoline shortage in the winter of 1973 caused demand for these types of vehicles to

---

[4]Checks deposited to a depositor's account are not considered collected until the payor bank has paid the depository bank for the instrument. A bank is not required to honor checks which exceed the current collected balance in its depositor's account. See ORS 74.2130. However, as a practical matter, most banks will honor checks drawn against uncollected funds — particularly if they have a proper perfected security agreement with the commercial customer and guarantee agreements.

drop dramatically, Jones was unable to generate sufficient cash flow to keep his operation afloat.

On December 13, 1973, Mr. Shideler, plaintiff's vice-president, inspected Jones' account. Shideler concluded that Jones was using the delay between the time Jones wrote a check in payment of vehicles and the time checks representing the proceeds from the sale, flooring or reflooring of those vehicles cleared their respective payor banks, to falsely inflate Jones' checking account. In effect, Jones was using the Bank's willingness to pay checks against uncollected funds to finance the operating costs of his wholesale-retail operation.

On December 15, 1973, Jones met with Lewis R. Brokenshire, plaintiff's president. Jones testified that at this meeting Brokenshire told him that the Bank would "stick it out with [him] until the gas crisis was over, until spring." This testimony was not rebutted.

On December 17, 1973, the Bank refused to pay checks drawn upon Jones' account which were in excess of collected funds. On the same day the Bank entered into one final flooring transaction with Jones. No cash disbursement was made to Jones, rather the entire amount of the transaction was credited to Jones' frozen account.

Defendants Vassil and Ell, learning that the Bank was refusing to honor checks drawn by Jones, stopped payment on all of their outstanding checks payable to Jones. By December 21, 1973, checks payable to Jones totaling $162,585 had been cancelled by defendants and others leaving Jones' account overdrawn by $86,034.79.

Between December 17 and December 21 Jones conveyed nearly all of his inventory not specifically covered by plaintiff's trust receipts. Defendant Vassil took the 13 automobiles to which he held title and trust receipts in satisfaction of the loans he had made to Jones. Jones conveyed other vehicles not covered by

trust receipts to various individuals to whom he was indebted. Sixty-six vehicles were transferred to defendant Ray Bruce, a used car wholesaler-retailer operating in Portland, Oregon. Mr. Bruce testified:

"Q   Can you tell us your story about the transaction that occurred on or about December 19th when we understand you purchased some 66 cars from R. L. Jones Motor Company, — this being in 1973?

"A   Yes I did.

"Q   Will you tell us the background of how this transaction came about?

"A   Well, I just (pause) — met Mr. Jones at the auction. Of course, the first time I thought he was joking, and later that day he called me and told me he wasn't, — this was in the afternoon of the 18th, I believe. He said that he was really serious and wanted to sell them, and I told him I would have to make arrangements for the financing, and he said he already knew that, and Mr. Ell told him he would be the one that would finance to buy the cars."

The transfer to Bruce may be characterized in either of two ways: as a self-help foreclosure by Ell and sale to Bruce, or as a purchase by Bruce with financing by Ell and payment of proceeds to Ell. Jones testified that it was he who first made the suggestion to Bruce that Bruce purchase some of the inventory. However, Jones also testified that he suggested the sale only after receipt of a letter from Ell demanding that he either liquidate portions of his inventory and pay off Ell or suffer foreclosure.

Ell testified that his only participation in the sale between Jones and Bruce was as a financier. However, the evidence shows that the checks given by Bruce for the inventory were made jointly payable to Jones and Ell and that the bills of sale given by Jones were made out not to Bruce but to Ell. The bulk of these vehicles were eventually returned to Ell for sale.

The 66 vehicles were sold for $165,704, the amount of Jones' indebtedness to Ell. The evidence reveals, however, that Ell had no security interest in 10 of the

vehicles transferred to Bruce. Furthermore, Ell's purported security interest in 11 of the vehicles transferred to Bruce is based upon trust receipts dated December 18, 1973. This is the day after Ell learned that Jones' checks were not being honored and Ell ordered payment be stopped on his checks outstanding to Jones. It is also the same day he wrote his foreclosure letter to Jones.

Plaintiff appeals from the following findings of fact and conclusions of law entered by the trial court:

"* * * * *.

"6. Both of the security agreements between plaintiff and defendant Jones were incomplete in substantial respects.

"7. In practice, monies loaned by plaintiff to defendant Jones were covered by notes and trust receipts on individual vehicles. The business transacted between them was conducted in a manner consistent with the terms and conditions of the notes and trust receipts.

"8. Defendant Jones violated the security agreements with plaintiff and plaintiff acquiesced in such violations until conditions in the trade presented an insurmountable emergency.

"9. The greater weight of the evidence establishes that it was never the intention of the parties that the overdraft should be covered by the security agreements.

"10. There is sufficient evidence of knowledge by plaintiff of the matter of defendant Jones' overdrafts to justify a denial of equitable relief.

"11. The conduct of the parties plaintiff and defendant Jones demonstrated an intention to abandon the security agreements and to rely upon the notes and trust receipts.

"* * * * *.

"CONCLUSIONS OF LAW

"1. The security agreements entered into between plaintiff and defendant Jones were ineffective and unenforceable.

"2. Plaintiff's security is limited to those vehicles upon which it held notes and trust receipts.

[ 657 ]

"3. Plaintiff's conduct was sufficient to justify equitable estoppel.

"* * * * *.

"6. Plaintiff is not entitled to recover against the defendants Ell, Vassil and Bruce.

"7. The defendants Ell, Vassil and Bruce may have judgment against plaintiff for their costs and disbursements.

"* * * * *."

The trial court's findings of fact and conclusions of law may, for ease of discussion, be divided into two general categories: those dealing with the coverage of the Bank-Jones security agreement and those dealing with its enforceability at equity. The latter category includes plaintiff's challenges to the applicability of equitable defenses, such as estoppel and unclean hands, in lawsuits brought to enforce rights granted by the Code. We turn first to those issues dealing with the scope and extent of the Bank-Jones security agreement.

At the time of the transactions relevant to the instant case, ORS 79.2030 provided that

"* * * a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

"(a) The collateral is in the possession of the secured party; or

"(b) The debtor has signed a security agreement which contains a description of the collateral * * *. In describing collateral, the word 'proceeds' is sufficient without further description to cover proceeds of any character."[5]

---

[5]This section was amended by Oregon Laws 1973, ch 504, sec 11 (effective January 1, 1974) to provide that

"* * * a security interest is not enforceable against the debtor or third party with respect to the collateral and does not attach unless:

"(a) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral * * *; and

"(b) Value has been given; and

"(c) The debtor has rights in the collateral.

"* * * * *."

[ 658 ]

ORS 79.1050(L) defines security agreement as "an agreement which creates or provides for a security interest."[6] Agreement is defined in ORS 71.2010 to mean:

"* * * * *.

"(3) * * * [T]he bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in ORS 71.2050 and 72.2080. Whether an agreement has legal consequences is determined by the provisions of the Uniform Commercial Code, if applicable; otherwise, by the law of contracts as specified in ORS 71.1030.

"* * * * *."

■ Thus, a creditor cannot claim a perfected security interest in collateral unless it has an enforceable security agreement with the debtor which describes the collateral to be charged with the security interest. However, such a security agreement is first of all a contract between debtor and creditor[7] and the parties are free under the Code to agree between themselves upon the extent of the security agreement and to negotiate the terms upon which they will deal with each other.[8]

The trial court concluded that the Bank-Jones security agreement of October 28, 1970, was ineffective and unenforceable. We disagree. The terms of the security agreement are critical to the case. The relevant parts provide:

"Section 2. Loan Agreement.

"2.1 Amount of Loan. The secured party from time to time will lend the debtor at debtor's request, such sums as the secured party in his discretion believes are adequately secured by this agreement.

---

[6]Previously ORS 79.1050(h), amended by Oregon Laws 1973, ch 504, sec 8.

[7]*J. K. Gill Company v. Fireside Realty,* 262 Or 486, 488, 499 P2d 813 (1972). *See also In re Laminated Veneers Co., Inc.,* 471 F2d 1124 (2d Cir 1973); *Matter of Metzler,* 405 F Supp 622 (1975); Henson, *Secured Transactions Under the Uniform Commercial Code* 26, § 3-10 (1973).

[8]*See Brown v. Jenkins,* 135 Ga App 694, 218 SE2d 690 (1975).

"2.2 Borrowing Percentage. The aggregate amount of the loans shall not exceed _____ % of the net value of the qualified inventory as hereinafter defined, plus 100% of the collected balance in debtor's cash collateral account. Should the aggregate amount of said loans at any time exceed said percentage, the entire loan, including the excess, is secured hereby.

"2.3 Debtor's Notes. All loans shall be evidenced by debtor's promissory note or notes payable either on demand or on such maturity as the secured party may fix; all notes shall bear interest at such rates and interest shall be payable at such intervals as the parties hereto shall agree upon at the time each loan is made.

"2.4 Other Charges. In addition to the principal and interest of the notes the debtor shall pay to the secured party upon his demand, all expenses incurred by the secured party to audit and service debtor's account and to preserve, collect, protect his interest in or realize on the collateral, including counsel fees and legal expenses, taxes and insurance premiums. All such expenses shall be part of the obligation secured by the collateral and shall bear interest at _10%_ per annum from the date advanced by the secured party until paid.

"2.5 Terms of Payment.

"(a) Deposit of Proceeds in Cash Collateral Account. Debtor, forthwith upon receipt of all checks, drafts, cash and other remittances (herein called proceeds) in part or full payment for any of the collateral, will deposit the proceeds in a cash collateral account maintained with the * * * Bank, over which the secured party alone shall have power of withdrawal. Pending such deposit the debtor shall not commingle any proceeds with any other funds or property of the debtor, but shall hold the proceeds separate and apart therefrom and upon an express trust for the secured party until deposited in the cash collateral account. Credit for proceeds deposited in the cash collateral account shall be conditional upon final payment of the deposited item. Once each week the secured party will apply the whole or any part of the collected funds on deposit in the cash collateral account against the principal

or interest of the notes and the other charges specified in Section 2.4, the order and method of such application to be in the discretion of the secured party. Any part of the cash collateral account which the secured party elects not to so apply may be paid over by the secured party to the debtor.

"* * * * *.

"(c) Goods Represented by Documents. If the collateral is represented or covered by documents of title, whether or not negotiable, in the possession of the secured party, the secured party, upon payment of the amount secured thereby, may release all or part of the documents or goods to the debtor.

"2.6 Statement of Account and Additional Collateral. Once each month the secured party may render a statement of account to the debtor showing the current status of the loans, service charges and the cash collateral account. If the statement or any interim statement indicates the loans outstanding exceed the borrowing percentage, the debtor either shall furnish additional collateral or pay the difference in cash.

"Section 3. Collateral.

"To secure the payment and performance of all obligations of the debtor set forth on this agreement, the note or notes and any other obligations of the debtor to the secured party, the debtor grants to the secured party a security interest in the following collateral:

"3.1 Inventory. All inventory now owned or hereafter acquired by the debtor.* ([*] All inventory, past, present and future of new and used motor vehicles, trucks and used motor vehicles, trucks and accessories and motor vehicles used as demonstrators or company cars, including general intangibles.).

"3.2 Accounts Receivable. All accounts of the debtor now existing or hereafter arising, which are proceeds of the inventory.

"3.3 Contract Rights. All contract rights of the debtor now existing or hereafter arising, relating to the inventory.

[ 661 ]

"3.4 Proceeds and Products. Proceeds and products of all the above.

"* * * * *.

"Section 5. Authority to Sell or Process Collateral. So long as debtor is not in default on the note or notes or in breach of any of the terms of this agreement, the debtor shall have the right to sell or process the inventory in the regular course of debtor's business.

"Section 6. Other Agreements of Debtor.

"* * * * *.

"6.7 Other Borrowing. Without the written consent of the secured party, the debtor will not engage in any other inventory or accounts receivable financing or create any indebtedness for money borrowed except loans made hereunder.

"* * * * *.

"Section 9. General.

"* * * * *.

"9.4 Non-waiver By Secured Party. Secured party shall not be deemed to have *waived* any of his rights under this or any other agreement or instrument signed by the debtor unless the waiver is in writing signed by the secured party. No delay in exercising secured party's rights shall be a waiver nor shall a waiver on one occasion operate as a waiver of such right on a future occasion.

"* * * * *." (Emphasis added.)

There is no allegation or evidence that plaintiff breached the Bank-Jones security agreement so as to render it unenforceable against Jones. Rather, defendants argue that

1. there are blanks in the agreement which render it incomplete and unenforceable;
2. the description of the property interests subject to the security agreement is inadequate;
3. the loans secured by the agreement do not include overdrafts on Jones' checking account with plaintiff; and
4. even if the agreement was initially effective, plaintiff has abandoned the agreement in favor of trust receipt flooring.

[ 662 ]

■ We note that the Bank-Jones security agreement is a standard preprinted form agreement.[9] It establishes a security interest in described collateral and sets out certain other agreements between the parties.

Two portions of this form security agreement contain unfilled blanks: paragraph 2.2, which sets forth the maximum borrowing percentage, and paragraph 2.5, which identifies the terms of a never-established cash collateral account. Since the agreement leaves the decision whether or not to make future loans to the Bank's discretion and further provides that the entire amount loaned is secured by the agreement regardless of whether or not such loans are in excess of the maximum loan limit established by the agreement, the parties' failure to complete paragraph 2.2 has no practical effect upon the parties' rights under the contract. Paragraph 2.5 concerns secondary rights of the secured party which do not relate to either the establishment of a security interest or to the identity of the loans or collateral covered by the agreement. Either provision may be stricken from the agreement as surplusage without affecting the enforceability of that portion of the contract setting forth the "security agreement."

■ No direct evidence pertaining to the parties' intent in leaving these provisions blank was introduced.

[9]Plaintiff and Jones entered into at least two security agreements. ORS 79.3030(2) provides that "[i]f a security interest is originally perfected in any way permitted under ORS 79.1010 to 79.5070 and is subsequently perfected in some other way under ORS 79.1010 to 79.5070, without an intermediate period when it was unperfected, the security interest shall be deemed to be perfected continuously for the purposes of ORS 79.1010 to 79.5070." It is the policy of the code that priorities under such later agreement relate back to the granting of the original security interest if there has been no interim period when the security interest was not perfected. Thus, it is not necessary that we here determine whether it was the intent of the parties that the second security agreement revoked or rescinded the former. The second security agreement is identical to the first except as to Jones' business location. The second security agreement was executed after Jones moved his operation to a new location. In the absence of evidence to the contrary, we infer that it was executed to reflect Jones' change of location and not to alter plaintiff's priority.

[ 663 ]

However, we do not find the blank spaces to render the writing meaningless or too indefinite for enforcement. We conclude that absent proof that it was the intention of the parties to make the filling of the blanks a condition precedent to the enforceability of the security agreement, the failure to fill in ancillary provisions not pertaining to the identity of the loans or collateral involved will not invalidate an otherwise effective security agreement.[10]

In *J. K. Gill Company v. Fireside Realty,* 262 Or 486, 488, 499 P2d 813 (1972), we held that a "security agreement, like any other contract, must be sufficiently certain in its terms so as to evidence the agreement of the parties." ORS 79.1100 provides that "any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described." The comment to this section states:

"* * * Under this rule courts should refuse to follow the holdings, often found in the older chattel mortgage cases, that descriptions are insufficient unless they are of the most exact and detailed nature, the so-called 'serial number' test. * * *"

See also, 1 Gilmore, Security Interests in Personal Property 350 (1965).

We find the language of the security agreement to reasonably describe and include within plaintiff's security interest all of the currently disputed automotive inventory and any proceeds therefrom.

---

[10] *See First Nat. Bank v. Hull,* 189 Neb 581, 204 NW2d 90 (1973) (Article 3 case); *Zimmerman Ford, Inc. v. Cheney,* 132 Ill App 2d 871, 271 NE2d 682 (1971). *See also, N. E. D. Holding Co. v. McKinley,* 246 NY 40, 157 NE 923 (1927) (Cardozo, C. J.); 15 Williston 831-33, § 1909 (3d ed 1972); Restatement of Contracts § 442(2), comment a; 17 Am Jur 2d, Contracts § 280. Also compare ORS 72.2040(3), pertaining to sales, which provides as follows:

"(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."

Having established the collateral covered, we now determine the extent of the debt secured by that collateral. Plaintiff contends the security agreement grants a security interest covering Jones' overdrafts as well as the loans evidenced by the individual trust receipts executed between it and Jones. To reach this reading, plaintiff relies upon the following language in Section 3 of the agreement:

> "To secure the payment and performance of obligations of the debtor set forth in this agreement, the note or notes and any other obligation of the debtor to the secured party, the debtor grants to the secured party a security interest in the following collateral:
> "* * * * *."

Plaintiff argues that under this provision the collateral covers (1) obligations of the debtor set forth in the agreement, (2) the note or notes, and (3) any other obligation of the debtor to the secured party. Defendants maintain that the phrase "the note or notes and any other obligation of the debtor to the secured party" should be read as a parenthetical describing the words "obligations of the debtor set forth in this agreement."

■ Section 3 of the security agreement is captioned "Collateral" and is primarily designed to identify the collateral subject to the security agreement, not the obligations which that collateral secures. Section 2 of the agreement is designated as the "Loan Agreement" section. Plaintiff was free to provide therein what sums owed by Jones were secured. Construing the contract as a whole, we read this "Loan Agreement" section as setting forth all of the obligations secured by the agreement, to-wit: loans evidenced by notes, interest, all expenses incurred by the secured party to audit and service debtor's account and to preserve, collect, protect his interest in or realize on the collateral, including counsel fees and legal expenses, taxes and insurance premiums. The reference to notes may be reasonably construed to include the trust receipts given by Jones to plaintiff. But, finding no reference to overdrafts in this section, we conclude that the obliga-

tions secured by the agreement include neither the overdrafts nor the costs and attorney fees pertaining thereto.

■ This conclusion makes it necessary that we review the trust receipt given by Jones to plaintiff on December 17, 1973. The general test applied by courts to determine whether a future advance falls within the future advances clause of a particular security agreement is that enunciated in *National Bank of Eastern Arkansas v. Blankenship,* 177 F Supp 667 (ED Ark 1959), *aff'd sub nom. National Bank of Eastern Arkansas v. General Mills, Inc.,* 283 F2d 574 (8th Cir 1960). There the district court held that no matter how the clause is drafted, the future advances, to be covered, must "be of the same class as the primary obligation * * * and so related to it that the consent of the debtor to its inclusion may be inferred." See also, 2 Gilmore, Security Interests in Personal Property 932 (1965); Note, *Curbing the Abuses of the Dragnet Clause,* 34 U Pitt L Rev 691 (1973); *Marine National Bank v. Airco, Inc.,* 389 F Supp 231 (D Pa 1975).

■ The loan evidenced by the last trust receipt of December 17, 1973, was credited directly by plaintiff to Jones' checking account. The only practical effect of this transaction was to reduce a portion of the previously unsecured debt created by the overdrafts against Jones' checking account. Unlike the other monies loaned pursuant to the security agreement, the December 17 transaction gave Jones no financing with which to floor new inventory. The funds, once credited to his checking account, were, as a consequence of the Bank's decision to pay checks only against collected funds, unavailable to Jones.

■ Although this transaction appears in form to conform to the security agreement, we find its substance to be different in kind and not related to the purpose intended by the parties when they entered into the October 28 security agreement. To hold otherwise would be to allow a creditor secured as to one line of

financing to retroactively secure a second separate indebtedness (not included in the loan section of the security agreement), and to step ahead of others holding perfected security interests in the same property. To permit such a belated reordering of priorities would do little to lend stability to commercial transactions. Consistency and predictability in commercial transactions is one of the purposes of the Uniform Code. We find the December 17 transaction not to be covered by plaintiff's security agreement with Jones.

Defendants next speak of plaintiff's having abandoned the security agreement to pursue trust receipt flooring. Although the use of the term "abandonment" is unusual in the law of secured transactions, the concept that a party may waive his rights under a security agreement is not. *See Clovis National Bank v. Thomas*, 77 NM 554, 425 P2d 726 (1967), discussed in *Baker Prod. Credit v. Long Cr. Meat*, 266 Or 643, 652-53, 513 P2d 1129 (1973). *See, e.g., Snyder v. Internat'l Harvester*, 147 Ind App 364, 261 NE2d 71 (1970); *Ford Motor Credit Co. v. Waters*, 273 So 2d 96 (Fla App 1973).

██ ██ In the instant case we do not find the evidence to support a finding that plaintiff waived its security interest under its October 28 security agreement with Jones. As previously discussed, the taking of trust receipts is not incompatible with the coexistence of a prior security interest in the same party. Nothing in the Code prohibits such practice. Furthermore, the instant trust receipts served as "the notes" required by the security agreement and provided a simple method of policing the collateral. As long as the Bank held the titles to the vehicles, the inventory could not be legally conveyed without its knowledge. Finally, Section 9.4 of the security agreement provides that any waiver must be in writing and that the waiver of one default does not waive subsequent defaults. No evidence was presented to indicate that plaintiff ever led Jones or third parties to believe that it was plaintiff's intention

not to stand on its security agreement, including the "no waiver" clause.

The evidence does reveal confusion among the parties as to the extent of plaintiff's security interest. However, the agreement was filed and perfected and its terms were readily ascertainable.

ORS 71.2050(4) provides:

"(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade."

The Comments to ORS 79.1010 set forth the purpose of the secured transactions portion of the Code as follows:

"* * * * *.

"The growing complexity of financing transactions forces us to keep piling new statutory provisions on top of our inadequate and already sufficiently complicated nineteenth-century structure of security law. The results of this continuing development are, and will be, increasing costs to both parties and increasing uncertainty as to their rights and the rights of third parties dealing with them.

"The aim of ORS 79.1010 to 79.5070 is to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greater certainty.

"* * * * *."

Lakin and Berger elaborate on the goals and purpose of the article in their text, *A Guide to Secured Transactions* (1970).

"The underlying basis for all the changes in the law of secured transactions made by Article 9 is simple: all the pre-Code formalities and technicalities have not prevented the rapid growth of secured commercial financing in the last one hundred years; they have merely made it more difficult, more risky for the lender and more expensive for the borrower. Consequently, by

making the secured transaction under Article 9 simple and legally safe the cost of credit will ultimately be reduced, which will thereby reduce the cost of goods to the manufacturer and to everyone in the chain of distribution, especially the ultimate consumer. It must be remembered that in the final analysis the consumer is the ultimate beneficiary of any cost reduction, because he pays for each and every component of cost — labor, taxes, materials, and interest — when he pays the purchase price of the goods he buys.

"\* \* \* \* \*.

"In short, Article 9 may be the American law's supreme response to the business needs of a continuously growing nation whose annual gross national product is about one trillion dollars. Its fundamental objective is simple and benign: to provide the legal framework within which secured transactions vital to the nation's economic health and stability can be effected simply, cheaply, openly, and safely." *Id.* at 67-68.

*See also, In re Ultra Precision Industries, Inc.,* 503 F2d 414 (9th Cir 1974).

■ Where an agreement is clear upon its face, a court should be hesitant to infer waiver from the post-agreement conduct of the secured creditor. *See Baker Prod. Credit v. Long Cr. Meat, supra; Borg-Warner Acceptance Corp. v. First National Bank of Pepistone,* 238 NW2d 612 (Minn 1976).

■ It must be remembered that plaintiff's financial statement was fully filed and perfected. Any subsequent creditors were thereby put on notice of plaintiff's claim. Defendants made no attempt to communicate with plaintiff to ascertain its security interest. Defendant Ell did contact Jones to determine the extent of plaintiff's security interest; however, a potential creditor cannot defeat a prior security interest merely by relying upon the uncorroborated assurances of his potential debtor.

We hold that the security agreement was valid and enforceable and that it, by its terms, grants plaintiff a security interest in all of Jones' inventory and the

proceeds therefrom. However, we also find the security· agreement does not cover plaintiff's advances to Jones which took the form of overdrafts, including the trust receipt transaction of December 17, 1973.

Having established that plaintiff has perfected security interest in all of Jones' inventory and proceeds therefrom, we turn to defendants' second set of defenses: that even if the underlying security interest is valid, the doctrines of estoppel and unclean hands render plaintiff's security interest unenforceable in equity. Plaintiff asserts that such equitable defenses are inapplicable to suits brought to indicate the legal priorities to collateral established by the Code. Plaintiff argues that:

> "The main point is that this case should be decided by consideration of the objective facts in the light of the UCC and the policy behind it and not by the so-called equities as the trial court attempted to do."

We find plaintiff's argument overly broad.

In *Evans Products v. Jorgensen,* 245 Or 362, 372, 421 P2d 978 (1966), we declined to apply the equitable doctrine of unjust enrichment in a suit involving priorities under the Code. We held:

> "The purpose and effectiveness of the UCC would be substantially impaired if interests created in compliance with UCC procedures could be defeated by application of the equitable doctrine of unjust enrichment. * * *"

It is also true that equity follows the law. *Scoggins v. State Construction,* 259 Or 371, 375, 485 P2d 391 (1971); *First Nat. Bk. v. Multnomah Lbr. & Box Co.,* 125 Or 598, 268 P 63 (1928).

This does not mean that equitable principles will never foreclose relief where the right is one established by statute. *See, e.g., Bergquist v. International Realty,* 272 Or 416, 537 P2d 553 (1975); *Lee v. Wood Products Credit Union,* 275 Or 445, 448, 551 P2d 446 (1976). It does mean that in applying equitable defenses the court should be sensitive to the public policy goals expressed by this state's statutory law.

[ 670 ]

Turning to the Code, we find equitable defenses such as estoppel explicitly preserved by ORS 71.1030, which provides as follows:

> "Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

*See Transamerica Ins. Co. v. U. S. Nat'l Bank,* 276 Or 945, 558 P2d 328 (1977); *Stumbo v. Hult Lumber Co.,* 251 Or 20, 40-41, 444 P2d 564 (1968); *Manson State Bank v. E. Diamond et al,* 227 NW2d 195, 16 UCC Reptr 1168 (Iowa 1975).

Thus, the applicability of equitable defenses will depend upon the nature of the fact situation to which defendants would have them apply and the effect of the defenses' application upon the policy objectives of the statute. In the instant case, defendants' estoppel and unclean hands defenses are based upon plaintiff's alleged failure to maintain proper supervision over Jones' inventory and alleged breach of its promise to continue to finance Jones until the used car market revitalized in the spring.

■ Defendants' contention that plaintiff failed to properly supervise the Jones inventory cannot be a basis for denying equitable relief. ORS 79.2050 provides that:

> "A security interest is not invalid or fraudulent against creditors by reason of liberty in the debtor to use, commingle or dispose of all or part of the collateral * * * or by reason of the failure of the secured party to require the debtor to account for proceeds or replace collateral. * * *."

See also Comments to ORS 79.2050.

■ One of the purposes of the Code is to facilitate inventory financing by relaxing pre-Code rules requiring close supervision of a debtor's inventory by his

secured creditor. Pre-Code decisions to the contrary are incompatible with modern high volume sales and accompanying quick inventory turnovers. See Lakin & Berger, *A Guide to Secured Transactions* 67-68, 107-110 (1970). Preservation of Code policy in this area forecloses the application of equitable defenses based upon plaintiff's alleged failure to supervise the inventory, or to supervise only those portions of the inventory upon which it held trust receipts.[11] The defendants' contention that plaintiff's conduct was so inequitable as to justify denial of equitable relief must fail.

We look now at defendants' unclean hands defense. This court has gone further than most jurisdictions and held that inequitable conduct by plaintiff towards third parties may foreclose equitable recovery. In *Oliphant v. French,* 256 Or 341, 347, 472 P2d 275 (1970), we stated:

> "Equity will refuse to aid a plaintiff whose claims had their inception in his own wrongdoing, whether the victim of that wrongdoing was the defendant, *Casteel v. King et al,* 201 Or 234, 269 P2d 529 (1954), or a third party. *Thompson v. Spint,* 247 Or 484, 430 P2d 1014 (1967) * * *."

However, in the instant case defendants have failed to prove that the Bank engaged in any conduct sufficient to justify the denial of equitable relief. As we stated in *First Nat. Bk. v. Multnomah Lbr. & Box Co.,* 125 Or 598, 622-23, 268 P 63 (1928):

> "* * * [T]he bank's conduct may have been harsh, but it had a right to insist upon the payment of the debts defendants owed it. * * * The court cannot serve as

---

[11] Without going into all of the elements of estoppel, we further note that one claiming the protection of that doctrine must prove reasonable reliance. *Willis v. Stager,* 257 Or 608, 619, 481 P2d 78 (1971). As has already been observed, a financing statement was filed by plaintiff. Any creditor or potential creditor doing business with Jones could easily have discovered the full extent of plaintiff's claimed security interest. Where a junior creditor has made no inquiry of the senior creditor, the presence of a financing statement must be held to negate the reasonableness of any reliance upon the senior creditor's conduct as reflecting the extent of the senior creditor's security interest.

controller of the morals of litigants so long as they keep within their legal rights. A court of equity in such matters must follow the law. We find that none of the acts of plaintiff bank constituted an illegal interference or intermeddling with the affairs of defendant[s] * * *."

■ The Bank was completely within its legal rights in refusing to honor checks drawn by Jones upon his checking account which were in excess of his collected balance. See ORS 74.2130(3), (4). See also, *Brady on Bank Checks* 272 (1977 Cumm Supp No. 1, 4th ed); *Merchant v. Worley,* 79 NM 771, 449 P2d 787 (1969). We find defendants' allegations of unclean hands to be unsupported by the evidence.[12]

■ Defendants' estoppel defense likewise must fail. Estoppel requires reasonable reliance on the part of the party claiming protection under the doctrine and harm resulting therefrom. In *Willis v. Stager,* 257 Or 608, 619, 481 P2d 78 (1971), we held:

"As for estoppel, it is well established that there can be no estoppel unless there was not only reliance, but a right of reliance, and that reliance is not justified where a party has knowledge to the contrary of the fact or representation allegedly relied upon. *Bradford v. Western Oldsmobile,* 222 Or 440, 452, 353 P2d 232 (1960). * * *"

---

[12]In a related case, *The Community Bank v. Ell,* 278 Or 417, 564 P2d 685 (1977), we held that the jury could find, on similar evidence, that the Bank had acted in bad faith. Our present holding is not inconsistent with that case.

The *Ell* case was an action at law to recover on certain checks to Jones upon which Ell had stopped payment. The Bank claimed to be a holder of the checks in due course, and its good faith was an issue in that context.

In the first place, we did not hold there that the Bank acted in bad faith as a matter of law, but only that a finding of bad faith by the jury would be permissible. In the second place, the specific question there was not whether the Bank had a right to refuse to honor Jones' checks if they were not covered by collected funds. It was, rather, whether the Bank, with knowledge that it intended to exercise its right to dishonor Jones' checks to Ell, accepted Ell's checks for deposit to Jones' account free of all defenses that Ell might have against Jones.

Regardless of what the jury was entitled to find in the *Ell* case, the Bank's behavior was not so inequitable as to deprive it of the right to enforce its valid security interest.

In the instant case there is no evidence that any defendant reasonably relied to his detriment upon plaintiff's alleged oral promise to Jones. Defendant Vassil did testify that Jones informed him of the Bank's promise and that he wrote a check in reliance on that information. However, Vassil did not rely on any statement by the Bank or its officers and the Bank's security agreement had been filed and perfected. Further, Vassil cancelled the check written in reliance upon Jones' statement of the Bank's promise and suffered no loss attributable to the Bank's decision to honor checks only against collected funds. Defendants have failed to establish the conditions necessary to institute a defense of equitable estoppel.

To summarize, we find plaintiff to have a prior perfected security interest in the entire inventory of R. L. Jones Motor Company and the proceeds therefrom. Secured by this interest are the amounts the trial court found by its Trial Judgment, signed October 20, 1975, and docketed October 22, 1975 (approximately $21,579.45), to be due plaintiff as the balance due on the trust receipts executed by Jones to plaintiff prior to December 17, 1973, together with interest, attorney fees and expenses incurred by plaintiff in realizing upon its security interest.

Having determined the extent of plaintiff's security interest, we examine the individual priorities of plaintiff and defendants Ell, Bruce and Vassil.

ORS 79.3120(5) sets forth the rule of priority applicable to the instant case. It provides:

> "(5) In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3) and (4) of this section), priority between conflicting security interests in the same collateral shall be determined according to the following rules:
>
> "(a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the

collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

"* * * * *."

■■ Vassil's security interest in the 13 cars taken by him was never perfected. Consequently, his interest is junior to plaintiff's. Ell's security interest was perfected, however, only after plaintiff had already perfected its security interest in the entire Jones inventory. Thus, his security interest is also junior to plaintiff's.

■ Neither Vassil nor Ell can claim the priority of a purchase money secured creditor. ORS 79.3120(3) provides:

"A perfected purchase money security interest in inventory has priority over a conflicting security interest in the same inventory and also has priority in identifiable cash proceeds received on or before the delivery of the inventory to a buyer if:

"(a) The purchase money security interest is perfected at the time the debtor receives possession of the inventory; * * *

"* * * * *."

At the time of these transactions, the Uniform Commercial Code provided that a security interest could not become perfected until it had "attached,"[13] and that it could not "attach" until value had been given.[14] The evidence shows Ell had not given value prior to Jones' possession of the vehicles listed on the trust

---

[13] ORS 79.3030(1) provides:

"(1) A security interest is perfected when it has attached and when all the applicable steps required for perfection have been taken. * * *.

"* * * * *."

[14] Prior to the 1973 amendments, ORS 79.2040(1) provided:

"A security interest cannot attach until there is agreement * * * that it attach and value is given and the debtor has rights in the collateral. * * *.

"* * * * *."

receipts and, as previously noted, Vassil's security interest was never perfected.

■ We find it unnecessary to determine whether the transaction between Jones, Ell and Bruce on December 18-19, 1973, was in fact a sale to Ell and resale to Bruce, or a direct sale to Bruce financed by Ell. If it is characterized as the former, Ell is liable to the Bank as a converter of the Bank's security interest in the Jones inventory. If it is characterized as the latter, Ell is liable as the recipient of identifiable proceeds in which the Bank had a perfected security interest.

ORS 79.3060 provides:

"(1) 'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Money, checks, deposit accounts, and the like are 'cash proceeds.' All other proceeds are 'noncash proceeds.'

"(2) Except where ORS 79.1010 to 79.5070 otherwise provide, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

"* * * * *."

The Inventory Loan and Security Agreement executed between plaintiff and Jones covers proceeds. It further provides, in Section 5, that:

"So long as debtor is not in default on the note or notes or in breach of any of the terms of this agreement, the debtor shall have the right to sell or process the inventory *in the regular course of debtor's business.*" (Emphasis added.)

■ The evidence is conclusive that the sale, regardless of whether it was to Ell or to Bruce, was not in Jones' ordinary course of business. Thus, plaintiff's security interest follows the collateral into Ell's possession

regardless of whether Ell acquired rights in Jones' inventory or in the proceeds therefrom. There is no tracing problem as the evidence reveals that the checks with which the inventory was purchased by Bruce were drawn to the joint order of Jones and Ell and that they were endorsed over to Ell by Jones.

■ Similarly, Bruce's interest will be junior to that of plaintiff regardless of how the transaction is characterized. Since plaintiff's rights in the Jones inventory continue regardless of sale where the sale was not in the ordinary course of Jones' business, Bruce would be free from plaintiff's security interest only if he could claim the protection of ORS 79.3070(1), which provides as follows:

> "(1) A buyer in ordinary course of business as defined in subsection (9) of ORS 71.2010, other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

ORS 71.2010 defines "buyer in ordinary course of business" as follows:

> "* * * * *.

> "(9) 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind * * *. 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a preexisting contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

> "* * * * *."

The term "bulk transfer" is defined in ORS 76.1020(1) as follows:

> "(1) A 'bulk transfer' is any transfer in bulk and not in the ordinary course of the transferor's business of a major part of the materials, supplies, merchandise or

[ 677 ]

other inventory as defined in ORS 79.1090 of an enterprise subject to ORS 76.1010 to ORS 76.1110. * * *"

Therefore, Bruce was not a buyer "in the ordinary course" by reason of the December 18-19 transfer of vehicles. Bruce, like Jones, is a used car wholesaler. The evidence convinces us that he was well aware of the financial realities of the sale, and that he was either directly or through Ell the recipient of a transfer in bulk of Jones' inventory. Bruce testified that it was rather unusual to be able to purchase inventory for the cost of the flooring and that he had purchased a larger quantity of cars on only one previous occasion — when he purchased a fleet of used cars from an auto rental company. He further testified that the method of removing the cars — having them driven off Jones' lot the evening of the sale — was also rather unusual.

We conclude that the interests of Vassil, Ell and Bruce are all subject to plaintiff's security interest in the Jones inventory and the proceeds therefrom. The trial court found the Bank's security interest to have been unenforceable and, therefore, did not reach the question of how the liability should be distributed among the defendants. The Code only establishes priorities among claimants of the same collateral. It sheds no light on the question of allocation where a plaintiff has legitimate claims against several different defendants, each of whom have interests in different portions of the inventory and proceeds claimed by plaintiff.

■ We note it to be a basic principle of equity that where a senior creditor has recourse to two funds and a junior creditor has recourse to but one of them, the senior creditor must seek to satisfy itself first out of the fund in which the junior creditor has no interest. *First Nat. Bank v. Connolly,* 172 Or 434, 494-95, 138 P2d 613, 143 P2d 243 (1943).

4 Pomeroy's Equity Jurisprudence 1062-063, § 1414 (5th ed 1941) states:

> "The equitable remedy of marshaling securities, with that of marshaling assets (see §§ 396, 410), depends upon the principle that a person having two funds to satisfy his demands shall not, by his election, disappoint a party having but one fund. The general rule is, that if one creditor, by virtue of a lien or interest, can resort to two funds, and another to one of them only, — as, for example, where a mortgagee holds a prior mortgage on two parcels of land, and a subsequent mortgage on but one of the parcels is given to another, — the former must seek satisfaction out of that fund which the latter cannot touch. If, therefore, the prior creditor resorts to the doubly charged fund, the subsequent creditor will be substituted, as far as possible, to his rights. * * *" (Footnotes omitted.)

It follows from this that plaintiff should first be required to seek recourse against those vehicles or proceeds in which none of the defendants has an interest. Our review of the evidence reveals none of the defendants to have had any interest in the proceeds of 10 of the vehicles transferred to Bruce pursuant to the December 18-19 transfer. Ell did have a security interest in the proceeds of the vehicles he floored for Jones; however, we find no evidence that the following vehicles were floored by Ell at the time of their sale to Bruce:

1972 Chevrolet ½ ton pickup (CCE142Z136194)
1973 Ford Pinto (3X12X135036)
1971 Dodge Polara (DM43N1D119322)
1972 Chevrolet Impala (1M57R2C110791)
1969 Oldsmobile Toronado (39489H2B143121)
1972 Lincoln Coupe (2481A864500)
1972 Chrysler (CH41T2C192956)
1972 Plymouth Duster (UL29G2B113396)
1973 Mercedes Benz 280S (11406012013390)
1972 Chevrolet Vega (1V16B7W200889)

The trial court, on remand, may require further evidence as to these and other vehicles conveyed by Jones.

From the above, it would appear that Ell has no claim to the proceeds of the sale of these vehicles and should be required to account for the amounts he received from their sale. Also, Vassil's interest is junior to that of the Bank. It is impossible for this court to order the priority of the respective parties as to each of the vehicles conveyed by Jones after December 17, 1973. As the parties did not brief or argue this issue, we find the interests of equity best served by remanding the case to the trial court to establish a method for the proper and equitable allocation of the liability and priority among the respective defendants and plaintiff.

Our findings also require the trial court to determine what portion of the costs and attorney fees incurred by the plaintiff in collecting its collateral and prosecuting this suit are related to the loans made pursuant to the security agreement and trust receipts prior to December 17, 1973, and which are not.

Reversed in part; modified in part and remanded for further proceedings.