Tayseer D. KITMITTO

v.

FIRST PENNSYLVANIA BANK, N.A.

Civ. A. No. 80–3563.

United States District Court,
E. D. Pennsylvania.

July 15, 1981.

Frederick C. N. Littleton, Philadelphia, Pa., for plaintiff.

Roslyn G. Pollack, Philadelphia, Pa., for defendant.

## MEMORANDUM

LUONGO, District Judge.

In this diversity action, plaintiff Tayseer D. Kitmitto (Kitmitto), alleges that defendant, First Pennsylvania Bank, N.A. (Bank), wrongfully sold certain United Parcel Securities pledged by Kitmitto as collateral for a loan made to a third party, Roy Hebebrand. Plaintiff contends that defendant (1) improperly applied the proceeds of the sale of the securities to satisfy additional advances made to Hebebrand, and (2) failed to give notice to plaintiff prior to the sale of the securities as allegedly required by the Uniform Commercial Code. Plaintiff further contends that the pledge agreement is voidable pursuant to 15 U.S.C. § 78cc(b) because defendant violated Regulation U of the Federal Reserve Board, 12 C.F.R. 222.3(a), by having plaintiff fill out two blank Regulation U–1 forms.[1] Defendant moves to dismiss on the ground that plaintiff has failed to state a claim upon which relief can be granted. F.R.Civ.P. 12(b)(6).

### I. The Scope of the Security Interest

On July 26, 1978, plaintiff pledged 2,196 shares of United Parcel Service (UPS) stock with the Bank as collateral for a $12,000 real estate loan to Roy Hebebrand. At the time of the loan plaintiff executed a pledge document, a request for withdrawal of his shares for hypothecation, and three Regulation U–1 forms, two of which were in blank. Subsequently, on three occasions, the Bank advanced additional sums to Hebebrand. Upon Hebebrand's default the Bank sold the stock and applied the proceeds to all of Hebebrand's outstanding indebtedness. Plaintiff claims that he pledged his securities for the initial $12,000 real estate loan only, and that the Bank's action in selling the securities and applying the proceeds to the subsequent advances constituted a wrongful conversion of his property. Defendant's motion to dismiss is based on its

---

1. A U–1 form is required to be filled out by the recipient of credit in "connection with an extension of credit secured directly or indirectly by any stock ...." 12 C.F.R. § 221.3(a). The form itself requires, among other things, that the borrower state the purpose for which he is seeking credit.

contention that the pledge agreement executed on July 26, 1978, unambiguously authorized the application of plaintiff's shares to future advances to Hebebrand.

Security agreements covering future advances are valid under Pennsylvania law. 13 Pa.Cons.Stat.Ann. § 9204(e), *Beyer Estate v. Bank of Pennsylvania*, 449 Pa. 24, 26, 295 A.2d 280 (1972). Whether a particular security agreement covers such advances depends on the intent of the parties. *Id. Marine National Bank v. Airco, Inc.*, 389 F.Supp. 231, 234 (W.D.Pa.1975).

> "Under Pennsylvania law, the intent of the contracting parties is exclusively determined from the written instrument if its words are 'clear and unambiguous' . . . . However, when the language of the written contract is ambiguous, extrinsic or parol evidence is admissible to resolve the ambiguity. . . . Although the interpretation of a written contract that is clear and unambiguous is for the court . . . once the court determines that parol evidence is pertinent to the construction of an ambiguous contract; (*sic*) it is for the jury to resolve the ambiguities and find the parties' intent."
>
> *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1271 (3d Cir. 1979) (footnote and citations omitted).

■ A contract is ambiguous if, viewed as a whole, it is reasonably susceptible of differing constructions. *Gerhart v. Henry Disston Sons, Inc.*, 290 F.2d 778, 782 (3d Cir. 1961); *Walther and Cie v. U. S. Fidelity & Guaranty Co.*, 397 F.Supp. 937, 942 (M.D.Pa. 1975). Therefore, once the non-moving party presents a reasonable reading of the contract which varies from that offered by the moving party "a question of fact as to the meaning of the contract exists which can only be resolved at trial." *Landtect Corporation v. State Mutual Life Assurance Company of America*, 605 F.2d 75, 80 (3d Cir. 1979). *See Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980).

Defendant contends that the pledge agreement is a security agreement which unambiguously covers future advances; that it is a conclusive indication of the parties' intent; and the parol evidence rule bars any evidence to the contrary. The pledge agreement does not contain an integration clause and I am satisfied that it was not an integrated contract. The peculiar nature of the U.P.S. stock at issue in the instant case, (*see* part II *infra*) made any pledge of the stock impossible unless Kitmitto executed a request for hypothecation of the shares to U.P.S. Further, the bank required Kitmitto to execute three U–1 forms prior to forwarding any sums to Hebrebrand. Accordingly, the scope of the agreement must be determined by all three documents.[2] After studying all of the documents it is not clear to me whether the parties intended the pledge of plaintiffs' stock to cover future advances.

The pledge provides, in pertinent part:

> "I [Tayseer D. Kittmito] hereby authorize you to receive, accept, or hold as security for all sums or debts now or hereafter owed to you by Roy Hebebrand the Borrower (including all extensions or renewals of the same), any and all of my property of any nature . . . especially 2196 shares United Parcel Service stock . . . .
>
> I expressly authorize you to treat my property and all other property held as collateral for such sums or debts in every respect as if it were the property of the Borrower and upon the release of any property to deliver the same to the Borrower, and I expressly declare all such property to be subject to all terms and any agreement made at any time with you by the Borrower and especially all terms of any collateral note executed by the Borrower."

In *Heffner v. First National Bank*, 311 Pa. 29, 33–34, 166 A. 370 (1933) the Pennsyl-

---

**2.** At oral argument defendant asserted that the pledge agreement was an integrated contract. Even if I agreed with that position, the fact that the pledge agreement was an integrated contract would not necessarily preclude considera-

tion of the remaining documents to determine if the pledge document was ambiguous. *See Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011–1012 & n.12–13 (3d Cir. 1980).

vania Supreme Court stated "A pledge, like any other contract, where there is any doubt as to its meaning, must be construed with some degree of strictness against the party preparing it . . . . The form signed . . . was the usual printed form note of appellee, and it was for the bank that prepared it to word it clearly in accordance with the meaning it now insists upon, by inserting words which adequately conveyed that meaning."

In the instant case the phrase "all sums or debts now or hereafter owed to you" is not unambiguous since a debt in existence at the time of the execution of the contract and not yet due would be "hereafter owed." This language falls far short of language used in Pennsylvania cases in which contracts have been held to cover future advances. In *Beyer Estate v. Bank of Pennsylvania*, 449 Pa. 24, 27, 295 A.2d 280, the document stated "said securities shall be collateral to secure any present *or future* advances, obligation or liability . . . ." (Emphasis supplied.) It is significant that the *Beyer* court did not hold that the language used in that case covered future advances as a matter of law. Rather, the court held that this language, when coupled with the parties' prior course of dealing, covered future advances.

Similarly, in *Heffner, supra*, the court indicated that a clause covering "this or any other liability or liabilities to said holder hereof, due or to become due, *or that may be hereafter contracted*," (emphasis supplied), would be sufficient to cover advances of the same type. In *Marine National Bank v. Airco, Inc.*, 389 F.Supp. 231, 234 (W.D.Pa. 1975), the language held to be sufficient was "all other liabilities of Borrower to Bank now or hereafter *incurred*." (Emphasis supplied.) Unlike the language used in the instant case, all of the clauses quoted above unambiguously apply to debts *created* in the future.

■ The language "all sums or debts now or hereafter owed to you" cannot, however, be construed in a vacuum. The intention of the parties must be gleaned from the contract as a whole. *Robert F. Felte, Inc. v.*

*White*, 451 Pa. 137, 143, 302 A.2d 347 (Pa. 1973). The language in the form pledge agreement which authorizes the bank to treat Kitmitto's property as if it was Hebebrand's and which provides that Kitmitto's property is subject to all agreements between the bank and Hebebrand seems to strongly indicate that the parties intended that the stock was pledged as security for future advances. However, as previously stated, other documents were executed as part of this transaction. The request for hypothecation, a form essential to consummation of the loan transaction, provided that the UPS shares were pledged as collateral for "a loan." Similarly, the only one of the three U–1 forms filled in on the same day as the pledge, notes that the credit extended for the collateral was $12,000. Construing the contract as a whole, therefore, I cannot say that the pledge agreement unambiguously covers future advances. Accordingly, since it must be determined whether the parties intended that the agreement covers advances, defendant's motion to dismiss must be denied.

There is an alternative ground for denying the motion. Plaintiff contends that even if the contract is construed as unambiguously encompassing future advances, the subsequent loans were of such a different character that consent to these advances cannot be inferred from the execution of the documents. In essence, plaintiff is seeking to invoke what has become known as the "relatedness rule." This rule serves to limit application of a future advance clause to those advances which are of the same class as the primary transaction. *See, e. g., Marine National Bank v. Airco, Inc.*, 389 F.Supp. 231, 234 (W.D.Pa.1975); *In Re Eshelman*, 10 U.C.C. Rep. 750, 752 (Bankruptcy E.D. Pa.1972); *Community Bank v. Jones*, 278 Or. 647, 566 P.2d 470, 482 (1977).

The relatedness rule developed prior to the enactment of the Uniform Commercial Code and was a reflection of the disfavor with which courts viewed future advance or dragnet clauses in security agreements. *See* 12A Pa.Stat.Ann. § 9–204(5) (Purdon

1970) (official comment) (repealed 1979),[3] 2 G. Gilmore, Security Interests in Personal Property, § 3513, at 920–21 (1965); Justice, Secured Transactions—What Floats Can Be Sunk, 24 Vill.L.Rev. 867, 899 (1979). Upon the enactment of the Code, with its express validation of future advance arrangements which were covered by the agreement, the question arose as to whether the relatedness rule survived. Professor Gilmore, who was one of the principal drafters of Article 9, was of the opinion that it did. He wrote:

"However 'covered by the security agreement' is to be read, § 9–204(5) should not be taken to overrule the so called 'dragnet' cases under pre-Code law. Legitimate future advance arrangements are validated under the Code, as indeed they generally were under pre-Code law. This useful device can, however, be abused; it is abused when a lender, relying on a broadly drafted clause, seeks to bring within the shelter of his security arrangements claims against the debtor which are unrelated to the course of financing that was contemplated by the parties. In the dragnet cases, the courts have regularly curbed such abuses: no matter how the clause is drafted, the future advances to be covered must 'be of the same class as the primary obligation . . . and so related to it that the consent of the debtor to its inclusion may be inferred.' The same tests of 'similarity' and 'relatedness', vague but useful, should be applied to § 9–204(5)."

2 Gilmore, *supra* at 932.

Adhering to this view, a number of courts have held that the relatedness rule applies to a future advance security agreement under the Code. *See, e. g., Marine National Bank v. Airco, Inc.*, 389 F.Supp. 231, 234 (W.D.Pa.1975); *National Bank of Arkansas v. General Mills, Inc.*, 177 F.Supp. 667 (E.D. Ark.1959), *aff'd sub nom. National Bank of Eastern Arkansas v. General Mills, Inc.*, 283 F.2d 574 (8th Cir. 1960); *Community Bank*

*v. Jones*, 278 Or. 647, 566 P.2d 470 (1977); *John Miller Supply Co. v. Western State Bank*, 55 Wis.2d 385, 199 N.W.2d 161, 165 (1972). Other courts, however, have applied the parol evidence rule and have held that unambiguous future advance clauses cover all future advances. *See, e. g., In re Riss Tanning Corp.*, 468 F.2d 1211, 1213 (2d Cir. 1972) (applying New York law); *In re Public Leasing Corporation*, 488 F.2d 1369, 1377–1378 (10th Cir. 1973) (applying Oklahoma law).

The Pennsylvania Supreme Court has expressly avoided the question of whether a broadly worded future advance clause covers non-related advances under the Code. *See Beyer Estate, supra*, 449 Pa. at 26 n.1, 295 A.2d 280. It appears, however, that the Pennsylvania Court would apply the relatedness rule in an applicable case. In *Heffner v. First National Bank, supra*, a 1933 pre-Code case, a husband and wife pledged securities owned by the wife as security for a loan on which they were jointly and severally liable and which had a future advance clause. The bank attempted to use the proceeds of the sale of the securities to satisfy debts of the husband incurred with others at a subsequent date. Inferring from the document that the securities were pledged only for liabilities similar to those incurred on the note, *i. e.*, joint liabilities, the court held that the individual debts of the husband were not secured by the collateral. *Id.* at 33, 295 A.2d 280. In so doing the court approvingly cited the rule that "collateral cannot be appropriated to a different . . . class of debts." *Id.* at 36, 295 A.2d 280. Although *Heffner* is factually distinguishable from the instant case as here all advances were made to Hebebrand, *Heffner* reflects the view that pledge agreements are to be strictly construed and that the parties will not be presumed, through rigid application of the parol evidence rule, to have intended that non-related advances be covered by the agreement in

---

**3.** In 1979, as part of the continuing process of consolidation and codification of Pennsylvania law, the Pennsylvania legislature transferred the text of the Uniform Commercial Code to title 13 of the Pennsylvania Consolidated Stat-

utes. The substantive law which had developed under the Code was left unchanged by the transfer. *See* 13 Pa.Cons.Stat.Ann. § 1101 (Purdons Pamphlet 1980) (explanatory notes).

the absence of a clear statement to that effect.

The relatedness rule has been held to apply in cases brought in the federal system in which Pennsylvania law was controlling. *See, e. g., Marine National Bank v. Airco, supra; In re Eshelman, supra.* While both of these cases applied the rule without discussion of Pennsylvania law, the result reached in them is not contrary to the strict approach to the reach of future advance clauses taken by the *Heffner* court.

■ Kitmitto has alleged that the only loan he agreed to pledge for was the initial $12,000 real estate loan. The record indicates that the three additional loans were for consolidation, consolidation and home improvement, and for an automobile. On this record plaintiff has created a material issue of fact as to whether all of the advances were within the same class so that they could all be found to have been within the reasonable contemplation of the parties. Accordingly, even if I were to find that the parties intended that future advances be covered by their agreement, defendant's motion must still be denied.

## II. *The Claim that Plaintiff was Entitled to Notice*

Plaintiff contends that defendant violated § 9–504(3) of the Uniform Commercial Code, 13 Pa.Cons.Stat.Ann. § 9504(c), by failing to notify him prior to the sale of his UPS stock. Defendant, while not conceding that it failed to give notice, moves to dismiss on the ground that the stock was of the type sold on a recognized market, and such sales are within an exception to the notice requirement.[4]

Under § 9504(c) a secured party must give notice to a debtor prior to sale of the collateral unless it "is perishable or threatens to decline speedily in value or is of the type customarily sold on a recognized market." Sales on recognized markets are exempted because the price in such a market

"represents the fair market value from day to day . . . [and] theoretically, the best price at any given time is the current market price." *Community Management Association v. Tousley*, 32 Colo.App. 33, 505 P.2d 1314, 1316 (1973). Accordingly, said sales are deemed to be commercially reasonable. 1A Bender's, Secured Transactions under U.C.C. § 8.04[2][a] at 899.

Neither the Code nor its comments, however, define the term recognized market. One commentator has stated that

"a recognized market is a market, dealing with fungible goods of sufficient depth and activity that efforts by any one party will not affect the price realized on the disposition of the collateral. . . . [A] 'recognized market' is one from which quotations are available that do not depend on the individual good sold in the market. Many commodities and most investment securities would fall into the category of 'recognized market'. A good, such as used cars, may not be found to be within the recognized market exemption as the price for each good is determined individually and the trade price lists are based on an average of sales and are meant as guides to price."

1A Bender's, Secured Transactions Under the U.C.C. § 8.04[2][a] at 901–902 (footnotes omitted). *See Alliance Discount Corporation v. Shaw*, 195 Pa.Super. 601, 604, 171 A.2d 548 (1961). Other commentators have stated that "any transaction which involves haggling over price or competitive bidding should not be considered as one conducted on a recognized market." White and Summers, Uniform Commercial Code, § 26–10 at 1111 (2d ed. 1980).

In the instant case the collateral was stock, which generally is sold in recognized markets. *See Marine Midland Bank-Rochester v. Vaeth*, 88 Misc.2d 657, 388 N.Y.S.2d 548, 550 (Sup.Ct. Monroe Cty.1976). *But see Rushton v. Shea*, 423 F.Supp. 468 (D.Del.1976) (stock held subject to notice

---

4. Because plaintiff has supplemented his position on this issue by way of an affidavit, the motion has become one for summary judgment. F.R.Civ.P. 12(b). Defendant has re-

sponded to the additional material offered by plaintiff but has not supplied any documentation in support of its position.

requirement without discussion of the recognized market issue). Unlike the stock in the *Marine Midland* case which was sold on the New York Stock Exchange, UPS stock is not sold on a public exchange. According to an affidavit by Frank Suchomel, Assistant Treasurer of UPS, the stock is issued and sold under the terms and conditions of the UPS Managers Incentive Plan and it is held in trust by the UPS Managers Stock Trust. The affidavit further states in pertinent part:

"4. The capital stock of U.P.S. is issued to employees of U.P.S. and can be transferred only to members of their immediate families . . . .

5. U.P.S. stock is issued subject, inter alia, to the following conditions:

a. It shall be held by the trustee for the benefit of the shareowner.

. . . .

c. It may not be sold by any person without giving U.P.S. a right of first refusal.

6. The value of U.P.S. capital stock is set periodically by U.P.S.

7. The stock is not listed or traded on any stock exchange.

8. U.P.S. has always exercised its right to repurchase its shares under the U.P.S. Managers Stock Trust . . . . ."

I am satisfied from this affidavit that there is no genuine material issue of fact as to whether UPS stock is sold on a recognized market. When the fact that the UPS trust sets the value of the stock is combined with the fact that UPS has always exercised its right of first refusal by repurchasing the stock it is clear that the UPS trust is the only market for the stock. It is apparent that there is no competitive bidding in the stock and the price paid by UPS is the best price which could be obtained for the stock because, in reality, it is the only price. The purpose of § 9–504(3)

would, therefore, not be furthered by subjecting this stock to the notice requirement. Accordingly, plaintiff has not stated a claim under that provision, and defendant is entitled to summary judgment on that ground.

### III. *The Regulation U Claim*

By way of supplemental memorandum, plaintiff claims that the bank violated the Federal Reserve Board's Regulation U, 12 C.F.R. § 221.1(a), *et seq.*, by having him fill out two blank U–1 forms and contends that this action makes the entire transaction voidable pursuant to § 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b).[5] Defendant moves to dismiss, contending that Regulation U applies only to extensions of credit for the purchase or carrying of margin stock and is, therefore, not applicable in the instant case.

Section 221.3(a) of Regulation U provides, in pertinent part:

"In connection with an extension of credit secured directly or indirectly by any stock, the bank shall obtain and retain in its records for at least 3 years after such credit is extinguished a statement in conformity with the requirements of Federal Reserve Form U–1 executed by the recipient of such extension of credit . . . and executed and accepted in good faith by a duly authorized officer of the bank prior to such extension. . . . "

12 C.F.R. § 221.3(a).

The U–1 form requires, among other things, that the person receiving the credit state the purpose for which he is obtaining credit.

This provision is part of Regulation U which was enacted pursuant to the authority contained in § 7 of the Securities Exchange Act of 1934, 15 U.S.C. § 78g(a), which sets forth the requirement for margin purchases of stock. The purpose of this section and Regulation U is to regulate the

---

**5.** 15 U.S.C. § 78cc(b) provides in pertinent part:

"(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of,

or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract. . . . "

flow of credit into securities markets to stabilize them and to "prevent speculation on credit from draining a disproportionate share of the nation's credit resources." *Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 469 F.2d 1166, 1180 (8th Cir. 1972). *See Daley v. Capitol Bank and Trust Company*, 506 F.2d 1375 (1st Cir. 1974).

In furtherance of this aim, Regulation U generally proscribes the extension of "credit secured directly for the purpose of purchasing or carrying any margin stock in an amount exceeding the maximum loan value of the collateral." 12 C.F.R. § 221(a). In light of the above, defendant contends that Regulation U was not violated because plaintiff has not alleged that the credit extended in this case was intended for the purchase of stocks and therefore further contends that there are no grounds for voiding the contract under 15 U.S.C. 78cc(b).

■ Under Regulation U, credit extended for the purpose of purchasing stock is known as purpose credit. 12 C.F.R. § 221.3. In *Daley v. Capitol Bank and Trust Company*, 506 F.2d 1375 (1st Cir. 1974), the Court of Appeals for the First Circuit considered whether the failure of a bank to have a debtor execute a U–1 form when the credit extended was non-purpose credit, violated Regulation U. What the court stated therein is persuasive in the instant case.

"[Plaintiff] ... contends that even if the loans were not purpose loans, the bank's failure to obtain from him a so-called 'purpose statement,' Form U–1, as to these loans violated 12 C.F.R. § 221.-3(a) and entitled him to rescind. Although the requirement that a bank obtain and retain a declaration of purpose from any borrower who pledges stock as collateral is not limited in terms to purpose loans, we are not persuaded by this argument. Even if the bank violated the regulation's technical recordkeeping requirement, the credits themselves cannot fairly be said to have been extended in violation of the regulation so as to permit rescission under § 29(b) of the Exchange Act. Non-purpose credit is not a concern of the Act or Regulation U .... The margin provisions were enacted primarily to stabilize the securities markets by regulating the flow of credit, and secondarily to protect margin stock purchases.... Since the credits were neither intended nor used to purchase margin stock, neither goal is served by allowing [plaintiff] to rescind. In fact, the purpose statement requirement was adopted to benefit the lending bank by affording it a defense against rescission when the statement was accepted in good faith.... We are aware of no authority supporting [plaintiff]'s attempt to use this shield of the bank as a sword against it. Nothing in the regulation renders the obligation [plaintiff] incurred improper ...."

*Id.* 1337–1338 (citations omitted).

Plaintiff has cited no case, nor has he set forth any support for the proposition that Regulation U applies to this transaction. Indeed the only case that plaintiff cites at all involved the extension of credit for the purpose of purchasing securities. See *Peoples National Bank v. Fowler*, 73 N.J. 88, 92–93, 372 A.2d 1096, *cert. denied sub nom.*, *Peoples National Bank v. Stonehill*, 434 U.S. 858, 98 S.Ct. 182, 54 L.Ed.2d 131 (1977).

Therefore, since plaintiff has failed to allege facts suggesting that the loan or loans in question were subject to Regulation U, his claim under the securities laws should be dismissed.

## IV. *Conclusion*

Plaintiff has failed to state a claim pursuant to Regulation U and pursuant to the notice requirements of § 9–504(3) of the Uniform Commercial Code, 13 Pa.Cons.Stat. Ann. § 9504(c), and the complaint will be dismissed insofar as it concerns those claims. Plaintiff has stated a claim for wrongful conversion of his securities and defendant's motion will be denied insofar as it encompasses that claim.